# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN DOE and JANE DOE, as the | ) | |
| Natural Parents and Next | ) | |
| Friends of Their Minor Child, | ) | |
| JAMES DOE, | ) | |
| | ) | |
|       Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:06-0924 |
| THE WILSON COUNTY SCHOOL | ) | Judge Echols |
| SYSTEM; DR. JIM DUNCAN, | ) | |
| Individually and as Director of | ) | |
| Wilson County Schools; WENDELL | ) | |
| MARLOWE, Principal of the | ) | |
| Lakeview Elementary School; | ) | |
| YVONNE SMITH, Assistant | ) | |
| Principal of Lakeview | ) | |
| Elementary School; and JANET | ) | |
| ADAMSON, Teacher at Lakeview | ) | |
| Elementary School, | ) | |
| | ) | |
|       Defendants. | ) | |

## MEMORANDUM

Before the Court are Defendants' Motion For Summary Judgment (Docket Entry No. 73) and Intervenor-Defendants' Motion for Summary Judgment (Docket Entry No. 77), to which Plaintiffs responded in opposition.

Plaintiffs John Doe and Jane Doe, on behalf of their son James Doe,[1] allege that Lakeview Elementary School ("Lakeview") in the public Wilson County School System engages in a pattern and practice of officially endorsing religious activities and particular religious beliefs. Plaintiffs do

---

[1]The Does proceed by pseudonym in accordance with the Magistrate Judge's Protective Order (Docket Entry No. 8).

1

not oppose the rights of students to pray at school or to express their religious beliefs. Rather, Plaintiffs allege they are offended and injured by Lakeview's repeated promotion and endorsement of Christianity. They seek injunctive relief to preclude Defendants from continuing to engage in a pattern and practice of official endorsement of religious activities and particular religious beliefs.

At all material times alleged in the Complaint, Dr. Jim Duncan, Wendell Marlowe, Yvonne Smith and Janet Adamson were employees of the Wilson County Board of Education. Dr. Duncan served as director of schools; Marlowe was principal of Lakeview, having held that position more than twenty years; Ms. Smith was assistant principal of Lakeview; and Ms. Adamson was a kindergarten teacher at Lakeview. During the 2005-2006 school year, Plaintiffs enrolled their five-year old son, James Doe, in kindergarten at Lakeview, and his assigned teacher was Ms. Adamson. Since the 2005-2006 school year, James Doe has been taught at home by his mother. The interpleading Defendants, Doug and Christy Gold and James and Jennifer Walker, are parents of children who attended Lakeview in 2005-2006 and who attend the school presently.

Most of the pertinent facts are undisputed, but where factual disputes exist, the Court examines the facts in the light most favorable to Plaintiffs, as the Court is required to do on a motion for summary judgment. Plaintiffs did not file a separate motion for summary judgment in their favor.

## I. <u>FACTS</u>

Lakeview is a small school with classes from kindergarten through fifth grade. The typical student is 5 to 12 years of age. The school day at Lakeview begins at 7:15 a.m. and ends at 2:15 p.m. Largely because of the age of the students and the availability of activities in the community, there are no student clubs, sports teams or extracurricular activities conducted by Lakeview.

2

The school facility is used after school hours for meetings and activities, such as Girl Scouts, Cub Scouts, and Tae Kwon-Do classes. Lakeview has written policies allowing facilities to be used for public, governmental, charitable, civic, recreational, and cultural purposes, and allowing community, educational, charitable, recreational, and other similar civic groups to advertise events in the school newsletter that are pertinent to students' interests or involvement. (Docket Entry No. 77-3 & 77-4.) Many community events have been advertised in the school newsletter, including a food drive conducted by the Cub Scouts, a sock hop, skate nights, a closet consignment sale and activities of the West Wilson Community Arts Alliance.

Concerning religious beliefs and holidays, the Wilson County Board of Education adopted the following policy, Number 4.803, effective June 3, 2004:

> No religious belief or nonbelief shall be promoted by the school system or its employees and none shall be belittled. All students and staff members shall be tolerant of each other's views. The school system shall use its opportunity to foster understanding and mutual respect among students and parents, whether it involves race, culture, economic background or religious beliefs. [footnote omitted] In that spirit of tolerance, students and staff members shall be excused from participating in practices which are contrary to their religious beliefs.

> RELIGIOUS HOLIDAYS

> Observance of religious holidays [footnote omitted] shall be as follows:

> 1. The several holidays throughout the year which have both a religious and a secular basis may be observed in the public schools; [footnote omitted]

> 2. The historical and contemporary values and the origin of religious holidays may be explained in an unbiased and objective manner without sectarian indoctrination;

> 3. Music, art, literature and drama having religious themes or basis are permitted as part of the curriculum for school sponsored activities and programs if presented in a prudent and objective manner and as a traditional part of the cultural and religious heritage of the particular holiday;

4. The use of religious symbols that are part of a religious holiday are permitted as a teaching aid or resource, provided such symbols are displayed as an example of the cultural and religious heritage of the holiday and are temporary in nature[;]

5. The school district's calendar shall be prepared so as to minimize conflicts with religious holidays of all faiths.

(Docket Entry No. 74-7 at 2.) At least once each school year, Dr. Duncan spoke to school administrators and supervisors about religious activities in the schools. He wanted administrators to be very mindful of the rights of others concerning religious activities that occur on school grounds and "for us not to get ourselves into a situation where it could be viewed that a particular religious organization was there to proselytize students and/or faculty members." (Marlowe Depo. at 36-37.) Dr. Duncan received very few, if any, requests to permit religious material to be sent home with students. (Duncan Depo. at 14.) He testified that he informed school principals that they could observe activities sponsored by church groups to maintain order and prevent any potential damage to school property but that the principals and teachers could not be active participants in religious activities. (Duncan Depo. at 20-21, 29.)

Lakeview parents, particularly those with children in the lower grades, may volunteer as teacher helpers and work in the classroom alongside the teacher during class hours. Responsibilities of the parent volunteers are determined by the teachers. Lakeview students are taught to respect adult authority figures, and volunteer parents are given the same level of respect as teachers. However, volunteer parents have no role in the discipline of students, they are not provided access to confidential academic testing or behavioral information, and they do not participate in any faculty or staff meetings. All visitors to Lakeview, including volunteer parents, must sign in and out at the office and wear a visitor's badge while present in the school.

During the 2005-2006 school year, Jane Doe served periodically as a volunteer teacher helper in Ms. Adamson's classroom where her son was a student. Intervenor Defendants Jennifer Walker and Christy Gold also served as volunteer teacher helpers in their children's classrooms.

In addition to serving as a volunteer teacher helper, Ms. Walker organized an adult group at Lakeview known as the Praying Parents. Christy Gold is a member of Praying Parents. The Walkers and the Golds state that they are Christians who believe it is important to participate in their children's education and to communicate their faith to their children and to others. The Praying Parents publicly describe themselves on their internet webpage as follows:

> "Praying Parents" is a group of Lakeview parents who meet once a month to pray for our school, faculty, staff, and children. We pray for specific needs as well as for school-related issues. We also try to provide occasional "treats" for our faculty and staff to remind them that we are praying for them. Praying Parents is not affiliated with any organization, nor do we promote a political agenda. We're just a group of parents who want to make an investment in our children's school through prayer.

(Docket Entry No. 1, Complaint Ex. 1.) The Praying Parents group is entirely financed by private parties. With Marlowe's permission, the Praying Parents' webpage was linked to the Lakeview website.

The Praying Parents meet at Lakeview on the first Friday of every month at 7:15 to 8:15 a.m., during the first hour of the school day. The Does have not witnessed a Praying Parents meeting. Although the Praying Parents meet in a partitioned area of the school cafeteria without the presence of school administrators, teachers, staff or students, Jane Doe testified that her son was well aware that the group meets regularly at the school.

According to Jane Doe, Praying Parents can be seen walking through school hallways during the school day, and they enter the teacher's lounge at will to leave flyers about Praying Parents

events and treats for the teachers in the teachers' mailboxes.[2]  If a teacher requests prayer, the Praying Parents pray for that teacher and place a prayer response card in the teacher's mailbox.  The Praying Parents place sufficient numbers of their flyers in the teachers' mailboxes so that the teachers can put one flyer in each student's folder.  The student folders are used to send home class assignments, school announcements, and other notices.   In this way, the Praying Parents communicate with other children's parents through the student folders.

The central office of the Wilson County Schools did not give its approval for the distribution of the Praying Parents flyers through student folders at Lakeview.  Dr. Duncan testified that, in his view, the distribution of Praying Parents flyers to students through teachers' mailboxes was not appropriate.  (Duncan Depo. at 30.)  The practice stopped at the beginning of the 2006-2007 school year after this lawsuit was filed.  Following initiation of this lawsuit, all approved flyers, including those regarding the Praying Parents, are made available at a counter in the school's main office or on a table in the individual classrooms.  Students are told they may choose whether to take the flyers home to their parents.

The Praying Parents also promote their activities through announcements in the Parent-Teacher Organization ("PTO") newsletter, "The Eagle Eye," which is periodically distributed to students and taken home in student folders.  According to Marlowe, Lakeview does not have control over everything that is published in the Eagle Eye.  If there is a question about content, the PTO President shows the school principal the Eagle Eye before its publication, and the principal has authority to suggest editorial changes.  (Marlowe Depo. at 29-30.)  Marlowe edited the Praying Parents' advertisement to ensure that it is nondenominational in nature and that it is "of

---

[2]Marlowe testified the Praying Parents go into the teacher's lounge for these purposes once a month.  (Marlowe at 62.)

informational value only to the extent of those individuals who would be interested in prayer–and doesn't matter if they're Christian, Protestant, Jew, whatever." (Id. at 66.)  Dr. Duncan was not aware that the Praying Parents regularly placed notices about their meetings in the Eagle Eye. (Duncan Depo. at 18-19.)

The Lakeview internet website is maintained by the school to provide information to parents, students and interested members of the community, including school news, regulations, and the school calendar.  No other group or organization besides the Praying Parents had a link on the Lakeview website.  Dr. Duncan did not know that the Praying Parents had a link on Lakeview's website.  After this lawsuit was filed, he learned that the link existed.  Because he believed the link provided only the time and location of the Praying Parents meeting and did not involve any particular students, he did not direct anyone to remove the link.  (Duncan Depo. at 16-17.)

Marlowe is not aware of any other public school in Wilson County in which a group called Praying Parents exists or facilitates similar activities.  Other groups, including those that have no religious affiliation, are permitted to use school facilities and equipment, distribute flyers concerning their activities, place notices in the PTO newsletter, and otherwise make known their activities. Marlowe gave his permission for the Praying Parents to meet in the school cafeteria during school hours, to access the teachers' mailboxes in the teachers' lounge (which is out of the view of students), and to send Praying Parents flyers home through the student folders.  Other groups were also allowed to place information about their groups in teachers' mailboxes. Jane Doe did not recall seeing any non-school related flyers in the student folder James Doe brought home other than the flyers of the Praying Parents.  Because James Doe could read and was curious about the flyers in his student folder, James Doe asked his mother to explain the flyers to him.

7

Marlowe specifically instructed the Praying Parents that, pursuant to policy, they are not allowed to have direct contact with students related to monthly meetings, and they are not allowed to give cards or notes to any student about the Praying Parents having prayed for that student. The Intervenor Defendants state that members of Praying Parents generally do not enter classes or speak to students, and they assert that members of Praying Parents have never asked to and do not want to enter into classrooms.

The Does present evidence, however, that on a day Jane Doe was scheduled to volunteer in the classroom, Ms. Adamson took her kindergarten class to an unscheduled assembly. During the assembly, Ms. Doe worked at a table in the hallway outside the classroom. Jennifer Walker approached Doe, introduced herself, and handed Doe a card which stated that the Praying Parents had been praying for a student in the class. Ms. Walker asked if Doe would pass the card to Ms. Adamson to be given to the student. Doe had seen Ms. Walker in the Lakeview hallways on other occasions pulling a rolling suitcase.

In September 2005 James Doe brought home a flyer in his student folder promoting the "See You At the Pole" event. The Does allege that the "See You At The Pole" event is religious and/or sectarian in nature.[3]

On the morning of September 21, 2005, Jane Doe and James Doe arrived at Lakeview to find a group of about 100 people surrounding the school flagpole near the drive-through and crosswalk used to enter the school. The group consisted of adults, teachers, and students who were attending the "See You At the Pole" event. Ms. Walker of Praying Parents organized the event, and the

---

[3]While the Does assert that the internet webpage for "See You At The Pole" describes the national event as a "Student-led, student-initiated movement of prayer," the Does have not included a copy of this webpage in the summary judgment record.

Walker and Gold families were present. The group participated in prayer, singing and recitation of Bible verses. The event was broadcast over a public address system owned by the school and used with Marlowe's permission. No school administrator or teacher assisted in leading the event. No one intimidated or pressured others to attend or participate in the event. Marlowe neither encouraged nor discouraged attendance by teachers and Lakeview employees at the event.

Although the Defendants state the program lasted from 6:40 to 7:00 a.m., Jane Doe asserts that the program continued after 7:00 a.m. She parked her vehicle in the parking lot and accompanied James Doe into the school. Because of the location of the parking lot, the Does could not avoid walking past the group at the flagpole to reach the crosswalk and enter the school. Other students arriving in their parents' cars or by school bus also had to pass alongside the assembled group in order to enter the school. Jane Doe noticed as she and her son walked by that Marlowe was present at the event and he was praying and participating like other attendees. (Jane Doe Depo. at 54-55.) Marlowe admitted that he was near the flagpole at the end of the crosswalk directing morning traffic as usual and that he attended the "See You At the Pole" event. (Marlowe Depo. at 52, 55-57.)

In November 2005, Ms. Adamson taught a two-week unit on the historical origins and traditions of the Thanksgiving holiday to her kindergarten students. According to Defendants, Ms. Adamson provides a weekly calendar of activities to her students' parents, including notice of her annual Thanksgiving unit. The unit's first week focuses on the involvement and contributions of the American Indian, and the second week focuses on the role and life of the Pilgrims, including their pursuit of religious freedom. Jane Doe volunteered in the classroom during the time period in question, but she testified she did not see any lesson plan concerning the Pilgrims' pursuit of

9

religious freedom or recall receiving a weekly calendar of events that gave notice of the annual Thanksgiving unit.

On the last day of the unit, the students dressed as American Indians and Ms. Adamson dressed as a Pilgrim. They prepared a Thanksgiving meal with the assistance of two volunteer parents. Jane Doe was not present as a volunteer on that day. Prior to eating the Thanksgiving meal, Ms. Adamson led her class in singing a prayer of thanks: "Thank you, God, for the world so sweet; thank you for the things we eat; thank you for the birds that sing; thank you, God, for everything." At the time the prayer was sung, Ms. Adamson did not tell her students that singing the prayer was voluntary, nor, according to the Does, did she alert parents of her students in advance that the prayer would be sung. John and Jane Doe learned of the event when they received a DVD at the end of the school year capturing highlights of their son's kindergarten year. (Docket Entry No. 94, Plaintiffs' Media File.) It is apparent watching the DVD that Ms. Adamson and the students practiced the prayer previously because she said, "Let's sing our song, please," and the students immediately joined in singing the prayer with her. Although Defendants suggest that Ms. Adamson informed her students that the simple blessing prayer and song about thanksgiving for health, strength, and daily food was likely similar to that which the Pilgrims would have used on the first Thanksgiving, Plaintiffs point out that no such explanation was given on the DVD provided to them. At no other time or in any other manner do similar prayers, blessings, and songs occur in Ms. Adamson's classroom, nor does Ms. Adamson encourage or discourage students from engaging in their own private prayers. Dr. Duncan felt that Ms. Adamson's use of the prayer in the historical context of the Thanksgiving holiday was appropriate. (Duncan Depo. at 34-35.)

10

In December 2005, as in prior years, the Lakeview kindergarten teachers organized a Christmas program involving all of the kindergarten classes. The program lasted approximately 20 to 22 minutes and was given following a PTO business meeting held in the evening, after school hours. The first twenty minutes of the program consisted of a recitation of Clement Clark Moore's "Twas the Night Before Christmas" (also known as "A Visit from St. Nicholas") by a student narrator with various role-playing by students and singing of Christmas carols by students. The carols included "Deck the Halls," "Jingle Bells," "Rudolph the Red Nosed Reindeer," "Up on the Housetop," "Must Be Santa," and "We Wish You A Merry Christmas." The Does thought that student participation in the Christmas program was required, so their son, James Doe, participated. The Eagle Eye included an announcement for the presentation which stated: "Bring your cameras . . . you won't want to miss this delightful play. Every child participates . . ." (Docket Entry No. 1, Complaint Ex. 5.)

The Does attended the program and videotaped it. Marlowe also attended, and the kindergarten teachers were present. At the conclusion of the program, two students dressed as Mary and Joseph stood next to a small crib containing a doll representing Jesus. Three children dressed as angels stood behind the crib. The audience was asked to join the children in singing one verse each of "Away in a Manger" and "Joy to the World." Only the words to these two songs were printed in the program distributed to the audience. (Id., Ex. 6.) The Does claim they were surprised by the re-creation of the nativity and the singing of religious Christmas carols.

Marlowe testified that the nativity scene had been used in the Christmas program for the previous five or six years and he approved of its inclusion. (Marlowe Depo. at 92.) Although Defendants state there have been occasions when parents have requested that their children not

participate in the program and such requests have been honored, the Does assert they were not informed of the program content in advance so that they could request their son not participate. Ms. Adamson attests, however, that she sent a letter home to parents in her students' folders explaining the Christmas program. She identified the roles particular children would play, including the parts of Mary, Joseph and the angels. She also identified the Christmas carols that would be sung.[4] (Docket Entry No. 97, Adamson Aff. ¶¶ 4-5 & Exs. 1 & 2.)

The Golds state that they would be distraught over the prospect of the school eliminating all Christmas carols and any other references to the birth of Jesus Christ, as it would reflect clear hostility toward their religious faith. They believe it would convey to their child that there is something wrong with his Christian understanding of Christmas. The Golds would also find it highly offensive if Lakeview taught about Thanksgiving or facilitated a Thanksgiving event, but failed to acknowledge its historical purpose of giving thanks to God.

During the 2005-2006 school year, Ms. Adamson had a child in her kindergarten class whose younger brother was suffering from leukemia. As part of a community-wide effort to support the family of the ill child, a concerned father of another Lakeview student composed and recorded an inspirational song. The lyrics of the song included references to Jesus. The parent made CD copies for purchase to raise funds for the family of the sick child. The parent's child, who was not a member of Ms. Adamson's class, dropped off a copy of the CD to Ms. Adamson's classroom because the sibling of the sick child was a member of Ms. Adamson's class. Because the sibling wanted to hear the CD and due to her family's situation, Ms. Adamson played the CD in the

_____

[4]The record reflects that, in December 2005, Jane Doe read a book about Hanukkah to James Doe's kindergarten class. Ms. Adamson invited Ms. Doe to read the book to the class upon learning during a field trip in October that Ms. Doe is Jewish. (Jane Doe Depo. at 61-62.)

classroom and allowed her class to listen to it.  At no other time has she played or permitted to be played in her classroom any similar inspirational or religious CD.  Marlowe testified that Ms. Adamson played the CD in class without his knowledge, but had he known about the circumstances, he would have given his permission for the CD to be played in class.  (Marlowe Depo. at 89.)

Near the end of the 2005-2006 school year, James Doe brought home a series of flyers in his student folder promoting an event called the National Day of Prayer that was to take place on May 4, 2006 in the Lakeview cafeteria from 6:40 to 7:00 a.m.  (Id., Ex. 3.)  The National Day of Prayer is a long-standing national event established by federal statute.[5]  The Does allege that this event is sectarian in nature.  The flyers did not identify what person or organization was organizing or sponsoring the event.  The flyers did not state that student participation in the event was voluntary or mandatory or that student participation required parental consent.  The flyers included a pair of hands brought together in prayer between two American flags.  The National Day of Prayer event was also promoted in the Eagle Eye newsletter.  (Id., Ex. 4.)  The notice in the Eagle Eye did not identify what person or group organized or sponsored the event, but it also included a pair of praying hands and an American flag.  To the Does, the praying hands were clearly indicative of Christianity because prayer in their own religion does not involve bringing the hands together.  Lakeview did not incur any costs for the flyers or notices advertising the National Day of Prayer.

According to Marlowe, the Praying Parents promoted the National Day of Prayer, with his consent, on the Lakeview website and in the Eagle Eye newsletter.  Marlowe also allowed a poster contest to promote the event, although he required participating students to create their posters at

_____

[5]Title 36 U.S.C. § 119 provides: "The President shall issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and meditation at churches, in groups and as individuals."

home. He permitted the Praying Parents to display the student's posters on the walls at the main entrance of Lakeview for about one week. Jane Doe saw the posters and described them as Christian-oriented and patriotic. James Doe was required to walk through the hallways where the posters were displayed.

Ms. Gold of Praying Parents organized the National Day of Prayer event, and the Walker and Gold families participated in the event. The Does did not participate. The event was financed solely through parents; the school provided no money for the event.

Marlowe, other Lakeview officials, teachers and students attended the National Day of Prayer, but Marlowe neither encouraged or discouraged attendance by teachers, employees and students. The event was held in a partitioned area of the school cafeteria. The school public address system was used with Marlowe's permission. The doors to the cafeteria were closed during the event. At some point during or after the event, stickers with the words "I Prayed" were passed out with Marlowe's permission. Marlowe wore one of the stickers. He immediately left the National Day of Prayer event at Lakeview and attended a principals' meeting at the central office while wearing the sticker. While at the meeting Marlowe received comments about the sticker like, "We're glad to know you prayed," or "What is the sticker for?" Marlowe told them the sticker was about the National Day of Prayer. (Marlowe Depo. at 88.) At least one student in James Doe's class wore a sticker. Ms. Adamson did not discuss with her kindergarten students the National Day of Prayer event.[6]

_____

[6]Marlowe testified that the Gideons distribute Bibles to fifth grade Lakeview students once each year, and this practice has occurred for most of twenty years. Marlowe informs the teachers in advance that the Gideons will visit the school. The Gideons offer the Bibles to students in the classroom without any type of verbal presentation. Students are not required to take a Bible. The Gideons are present in the classroom briefly. (Marlowe Depo. at 101-102.) The Does do not challenge this practice, presumably because James Doe is not yet a fifth grade student in attendance

The Does did not complain to school administrators about these incidents as they occurred during the school year. Near the end of the 2005-2006 school year, Jane Doe met with Ms. Smith about the Does' concerns that these activities amounted to unconstitutional endorsement of Christianity and that their son, James Doe, felt ostracized. According to the Does, Ms. Smith initially seemed open to their concerns. However, after the meeting, Ms. Smith apparently discussed the matter with Marlowe. Ms. Smith called Jane Doe the following day and cited court cases in support of the religious activities at Lakeview. According to Jane Doe, Ms. Smith said: "We're kind of out here by ourselves. And we have a reputation as a religious school built on a religious foundation with religious teachers who don't teach religions. And we are different denominations." (Jane Doe Depo. at 87.)

John and Jane Doe then met with Marlowe. According to the Does, he informed them that no changes would be made to address their complaints. As a result, the Does removed James Doe from Lakeview and schooled him at home. Jane Doe testified that, but for the allegedly unconstitutional acts of the Defendants, James Doe and his younger sibling would attend Lakeview.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson

_____

at the school.

15

v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

Precisely because of the religious diversity that is our national heritage, Allegheny County v. ACLU, 492 U.S. 573, 589 (1989), the First Amendment declares:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const., amend. I.  In the early days of the Republic, perhaps "these words were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.'" Allegheny County, 492 U.S. 573, 590 (1989) (quoting Wallace v. Jaffree, 472 U.S. 38, 52 (1985)).  The Establishment Clause means that "government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their

religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs." <u>Id.</u> (footnotes omitted).

Both the Establishment Clause and the Free Exercise Clause of the First Amendment operate against the states and their political subdivisions by virtue of the Fourteenth Amendment. <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 301 (2000); <u>School Dist. of Abington Township v. Schempp</u>, 374 U.S. 203, 215 (1963). The government is required to maintain strict neutrality, neither aiding nor opposing religion. <u>Schempp</u>, 374 U.S. at 225; <u>Good News Club v. Milford Central Sch.</u>, 533 U.S. 98, 114 (2001). "[A]ll creeds must be tolerated and none favored." <u>Lee v. Weisman</u>, 506 U.S. 590 (1992). The Establishment Clause "prohibits government from appearing to take a position on questions of religious beliefs or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" <u>Allegheny County</u>, 492 U.S. at 594 (quoting <u>Lynch v. Donnelly</u>, 465 U.S. 668 (1984)). The Establishment Clause not only limits the religious content of the school's own communications, but it also prohibits the school's support and promotion of religious communications by religious organizations. <u>Id.</u> at 600.

Like the Due Process Clauses, however, the Establishment Clause "is not a precise, detailed provision in a legal code capable of ready application." <u>Lynch</u>, 465 U.S. at 678. Rather, the Founders included the Establishment Clause to state an objective. <u>Id.</u> "The line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a 'blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.'" <u>Id.</u> (quoted case omitted).

Case 3:06-cv-00924   Document 110   Filed 11/09/07   Page 17 of 32 PageID #: 773

Local school boards are afforded considerable discretion in operating public schools. Edwards v. Aguillard, 482 U.S. 578, 583 (1987). At the same time, however, the school boards' discretion "'must be exercised in a manner that comports with the transcendent imperatives of the First Amendment.'" Id. (quoting Board of Educ. v. Pico, 457 U.S. 853, 864 (1982)). The Supreme Court has been especially vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Id. at 583-584. This is because

> [f]amilies entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. . . . The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure. . . . Furthermore, "[t]he public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools [.]

Id. at 584. Thus, there are heightened concerns about protecting freedom of conscience from subtle coercive pressure in the elementary schools. Lee, 505 U.S. at 592. "School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherants 'that they are outsiders, not full members of the political community, and an accompanying message to adherants that they are insiders, favored members of the political community.'" Santa Fe Indep. Sch. Dist., 530 U.S. at 309 (quoting Lynch, 465 U.S. at 688 (O'Connor, J., concurring)). Consequently, the Supreme Court often has been required to invalidate statutes, policies, and practices which advance religion in public elementary and secondary schools. Edwards, 482 U.S. at 584.

Courts review government actions challenged under the Establishment Clause using the three-part test set forth in Lemon v. Kurtzman, 403 U.S. 602 (1971). Under that test, in order for

18

a governmental practice to satisfy the Establishment Clause, the action must (1) reflect a clearly secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion.  Id. at 612-613.  The first prong of the Lemon test focuses on whether the government intended to convey a message of endorsement or disapproval of religion.  Coles v. Cleveland Bd. of Educ., 171 F.3d 369, 384 (6th Cir. 1999).  The second and third prongs focus on endorsement or disapproval of religion and government entanglement with religion.  If the challenged practice or policy fails any one of the three prongs of the Lemon test, it violates the Establishment Clause.  Stone v. Graham, 449 U.S. 39, 40-41 (1980).

The Lemon test has come under criticism, but the Supreme Court has not overruled or abandoned it, and courts continue to apply it.  The Court of Appeals for the Sixth Circuit recognizes that the Supreme Court in recent years has applied what is known as the "endorsement" test, which "looks to whether a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government." Adland v. Russ, 307 F.3d 471, 479 (6th Cir. 2002) (and cases cited therein).  The relevant observers are the parents because students cannot participate in activities without their parents' permission.  Rusk v. Crestview Local Sch. Dist., 379 F.3d 418, 421 (6th Cir. 2004).  A practice "endorses" religion if it conveys a message that religion or a particular religious belief is favored or preferred.  Allegheny County, 492 U.S. at 593.  While the Sixth Circuit cases "have variously interpreted the endorsement test as a refinement or modification of the first and second prongs [of the Lemon test] . . . a clarification of the first prong . . . and as a modification of the entire Lemon test," see Adland, 307 F.3d at 479, this Court will treat the endorsement test as a refinement of the second and third parts of the Lemon test.  See Lynch, 465 U.S. at 690-694

(O'Connor, J., concurring) ("Focusing on institutional entanglement and on endorsement or disapproval of religion clarifies the <u>Lemon</u> test as an analytical device.")

With all of these legal precepts in mind, the Court will turn to the specific facts presented in this case. The Court will examine each practice challenged by the Does to determine whether Defendants and the Intervenor Defendants have shown that they are entitled to summary judgment in their favor on the factual record before the Court.

## A. Praying Parents Meetings and Communications

The Praying Parents is a small, informal group of Lakeview parents who meet once a month to pray for the school, faculty, students, and staff. The Praying Parents group claims that it is not affiliated with any organization and does not promote a political agenda. The group was formed "to make an investment" in Lakeview through prayer. According to Defendants, the group meets once each month in a partitioned area of the school cafeteria from 7:15 to 8:15 a.m., the first hour of the school day. The doors to the cafeteria are closed and no students, faculty, administrators or staff attend the Praying Parents meetings. Members of the group have access to the teacher's lounge to provide treats for the teachers to let them know that the group is praying for them. The Praying Parents have access to teacher mailboxes to leave prayer response cards and flyers promoting Praying Parents meetings for distribution to students, who ultimately take them home to their parents. The Praying Parents advertise their meetings in the Eagle Eye. On occasion Marlowe edited their advertisements to ensure they were nondenominational and of informational value to anyone interested in prayer, regardless of creed. Defendants and Intervenor Defendants assert that the Praying Parents group has a secular purpose: to encourage parent involvement in the school's educational mission.

20

"'The purpose prong of the <u>Lemon</u> test asks whether government's actual purpose is to endorse or disapprove of religion.'" <u>Edwards</u>, 482 U.S. at 585 (quoting <u>Lynch</u>, 465 U.S. at 690 (O'Connor, J., concurring)). The intention may be shown by promotion of religion in general, or by advancement of a particular religious belief. <u>Id.</u> Although a totally secular purpose is not required, the secular purpose requirement is not satisfied by the mere existence of some secular purpose, however dominated by religious purposes. <u>Adland</u>, 307 F.3d at 480. And while the Court must accord some deference to Defendants' avowed intention, the Court must distinguish a sham secular purpose from a sincere one. <u>See</u> <u>Santa Fe Indep. Sch. Dist.</u>, 530 U.S. at 308.

The Does present evidence that the Praying Parents group may be quite active in the Lakeview school community. Jane Doe testified that she observed Jennifer Walker, organizer of the Praying Parents, in the school hallways on several occasions. It is not clear from this testimony whether Ms. Walker was present only on days when the Praying Parents were holding monthly meetings or whether Ms. Walker was present in the school on behalf of the Praying Parents group more frequently. While Marlowe testified that he instructed the Praying Parents not to contact any student directly concerning prayers said for them by the Praying Parents, Jane Doe described one occasion when Ms. Walker approached her as she worked in the hallway outside of Ms. Adamson's classroom. Walker asked Doe to give a Praying Parents note to Ms. Adamson, who would in turn give the note to a particular student for whom the group had prayed.

The evidence further indicates that Marlowe gave his permission only to the Praying Parents to meet on school property during school hours at the same time students are present in classrooms. Although the doors to the cafeteria where the Praying Parents meetings were held were closed and students did not attend the meetings, James Doe, a kindergartner, was well aware that the Praying

Parents met regularly at the school. John and Jane Doe did not attend any Praying Parents meetings, but they were also aware of the group's activities as a result of receiving the flyers James Doe brought home in his student folder. Further, as described above, Ms. Walker approached Ms. Doe and asked her to forward a Praying Parents note to Ms. Adamson for a student.

There is no evidence in the record that any other non-school group was permitted to meet on school property during school hours. Further, the record indicates that Marlowe gave his permission only to the Praying Parents for the installation of a link to the Praying Parents' webpage on the Lakeview website. No other non-school group had a similar website link.

Contrary to the Defendant Intervenors' contention that the Does were not offended observers, the Court finds that the Does have standing to challenge the activities of the Praying Parents. Parents have a constitutionally protected interest in guiding the religious future and education of their children. Wisconsin v. Yoder, 406 U.S. 205, 232 (1972); Washegesic v. Bloomingdale Pub. Schs., 33 F.3d 679, 683 (6th Cir. 1994) (observing parents may obtain redress for wrongdoings which directly affect their children); Steele v. Van Buren Public Sch. Dist., 845 F.2d 1492, 1495 (8th Cir. 1988) (same). "[S]chool children who are subjected to unwelcome religious exercises or are forced to assume special burdens to avoid them have standing to complain of an Establishment Clause violation." Daugherty v. Vanguard Charter School Academy, 116 F.Supp.2d 897, 905 (W.D. Mich. 2000); Adland, 307 F.3d at 477 (to meet Article III standing, party must show actual or threatened injury which is fairly traceable to challenged action and substantial likelihood the relief requested will redress or prevent the plaintiff's injury).

Here the Does assert burdens on their interests that are direct and personal, not merely hypothetical or abstract, and are clearly sufficient to confer "injured party" standing on them. See

22

id. The Does knew about the Praying Parents meetings and they received flyers and copies of the Eagle Eye which advertised the activities of the group. The Does claim they were offended and injured by such exposures. This is sufficient to establish standing.[7] See Washegesic, 33 F.3d at 683.

Praying Parents meetings during school hours and the presence of a Praying Parents link on the school website are problematic in that they tend to show that the Praying Parents group held an exalted position at the Lakeview school. When the meetings during school hours and the unique weblink are viewed in light of the numerous communications and advertisements the Praying Parents made through school communication channels, a reasonable observer could conclude that the Praying Parents wielded significant religious influence among the administration, faculty, staff and students, despite the contention that the Praying Parents group exists only to advance the secular purpose of encouraging parental involvement in Lakeview's educational mission. See Santa Fe Indep. Sch. Dist., 530 U.S. at 305 (noting degree of school involvement in religious activity determines extent of perceived and actual endorsement of or entanglement in religion); Daugherty, 116 F.Supp.2d at 911 ("If defendants manipulated the facially neutral policy so as to give preferential access to religious literature or certain religious literature, then an Establishment Clause violation might be made out.")

Defendants constitutionally may allow the Praying Parents to enjoy the same access to school property and school resources as other non-religious groups are allowed. Thus, if non-religious groups are allowed to meet on school property, have access to teachers' mailboxes, send flyers home with students, and advertise their activities in the Eagle Eye, then Praying Parents are entitled to similar consideration, otherwise Lakeview may demonstrate hostility to religion and violate the First

_____

[7]It is unnecessary for the Court to address whether John and Jane Doe have taxpayer standing.

Amendment through unreasonable viewpoint discrimination. See Good News Club, 533 U.S. at 106-107, 114 ("The Good News Club seeks nothing more than to be treated neutrally and given access to speak about the same topics as are other groups."); Rosenberger v. University of Virginia, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 394-395 (1993) (holding school board could not deny church right to show film on school property where permission was denied solely because film dealt with an otherwise permissible subject from a religious standpoint); Rusk, 379 F.3d at 424; Daugherty, 116 F.Supp.2d at 908. But Lakeview administrators cannot constitutionally favor the Praying Parents over non-religious groups or give the Praying Parents special privileges that other groups do not receive, such as permitting meetings on school property during school hours and providing a link on Lakeview's website. Cf. Good News Club, 533 U.S. at 117 n.7 (distinguishing Schempp which found an Establishment Clause violation where challenged activity occurred during the school day).

It does not appear from the proof submitted at this stage that the Does will not be able to prove at trial that the purported secular purpose of the Praying Parents is overshadowed by its religious purpose, or that a reasonable observer could believe that Defendants' preferred treatment of the Praying Parents group constituted an endorsement of religion by the Lakeview administration and the Wilson County School System. See Allegheny County, 492 U.S. at 59; Adland, 307 F.3d at 479. Further, the evidence suggesting that Defendants favored or promoted the Praying Parents over non-religious groups, if proved at trial, could support a conclusion that Lakeview was excessively entangled with religion. Thus, all three prongs of the Lemon test remain in issue with regard to the school's involvement with the Praying Parents group.

Genuine issues of material fact exist which the Court must resolve following trial before the Court can definitively rule whether the <u>Lemon</u> test has been satisfied. Defendants and Intervening Defendants have not shown that they are entitled to summary judgment on this record as a matter of law at this time.

**B. See You At the Pole and National Day of Prayer**

Jennifer Walker of the Praying Parents organized the See You At The Pole event (hereinafter "flagpole event") held at Lakeview in September 2005. Christy Gold of the Praying Parents organized the National Day of Prayer event (hereinafter "prayer event") held at Lakeview in May 2006. There is no evidence in the record that any Lakeview student, teacher, or administrator participated in planning or organizing these events. With the principal's permission, both events were held on school property and utilized the school public address system. The school did not provide any funds for these events. The Praying Parents provided teachers with flyers to advertise both events, and these flyers were sent home with students in their student folders. The events were also advertised in the Eagle Eye.

The advertisements and flyers for the prayer event included a pair of praying hands alongside one or more American flags. Jane Doe testified that, from her perspective, the praying hands symbolized Christianity because in her own and in other religions, hands are not brought together to pray. <u>See</u> <u>Lee</u>, 505 U.S. at 588 (observing the use of images identified with a particular religion may foster a different sort of sectarian rivalry than if more neutral images are used).

Additionally, Marlowe permitted the Praying Parents to conduct a poster contest among the students to promote the prayer event. While students were required to make their posters at home, Marlowe permitted the Praying Parents to display the posters on the walls inside the main entrance

25

of Lakeview for about a week. James Doe and his mother were required to pass by these posters to enter the school. Jane Doe testified the posters were religious and patriotic in character.

Both the flagpole and prayer events involved religious activities such as prayer and scripture readings. Lakeview's principal, and some teachers, parents and students voluntarily attended these events. The Does contest whether the flagpole event concluded before 7:00 a.m., but there does not appear to be any dispute that the prayer event concluded by 7:00 a.m.

Jane and James Doe were required to pass by the flagpole event in order to reach the crosswalk near the parking lot and enter the school. As they passed by, Jane Doe noticed the principal, Marlowe, participating in the event to the same extent other attendees were participating.

The Does did not attend the prayer event, which was held in a partitioned area of the school cafeteria. During the prayer event, stickers were provided stating, "I Prayed." Marlowe accepted and wore one of these stickers. At least one of James Doe's classmates wore an "I Prayed" sticker. The record indicates that a teacher or teacher's assistant may have entered Ms. Adamson's classroom after the prayer event and distributed "I Prayed" stickers in the classroom.

The Defendant Intervenors again assert that the Does lack standing to challenge these two specific events because the Does did not attend and they were not offended observers. The Court disagrees and finds that the Does have standing to challenge both activities. See Daugherty, 116 F.Supp.2d at 905. Jane and James Doe were directly exposed to the flagpole event on the morning it occurred as they approached the school. The Does could see for themselves that Marlowe and some Lakeview teachers were participating in the event. Although the Does did not witness the prayer event, they viewed students' promotional posters displayed in the school hallways prior to the event and at least one of James Doe's classmates wore an "I Prayed" sticker at school

26

after the event.  Stickers may have been distributed in James Doe's kindergarten classroom.  The Does received flyers in their child's student folder advertising both events, and due to their son's curiosity, they allege they were required to explain the flyers to him.  The Does claim they were offended and injured by these exposures.  The Court finds the evidence is sufficient to establish the Does' standing to make a constitutional challenge.  See Doe, 494 F.3d at 497.

The Defendants and Defendant Intervenors have not identified any secular purpose supporting the flagpole event.  Defendant Intervenors suggest that the prayer event represents historic traditions honoring our religious history, and the event was held prior to school hours.  Defendants argue that the Supreme Court has never extended its Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because such conduct takes place on school premises where elementary school children are present, citing Good News Club, 533 U.S. at 116.  In fact, Defendants contend, courts have upheld a student group's right to engage in morning prayer at the school flagpole, relying on Westfield High Sch. L.I.F.E. Club v. City of Westfield, 249 F. Supp.2d 98, 118 (D. Mass. 2003).

The Westfield case mentioned only briefly that the school permitted a L.I.F.E. club to meet before school at the flagpole for morning prayer.  249 F.Supp.2d at 102.  The critical fact in Westfield was that the religious activities at issue were student-initiated and student-led.  Id.  In the case at bar, no student or student club planned the flagpole event or the prayer event.  Jennifer Walker, Christy Gold, and the Praying Parents planned and led these events with the permission of the Lakeview principal and teachers, some of whom participated.  See Chandler v. Siegelman, 230 F.3d 1313, 1317 (11th Cir. 2000) ("So long as the prayer is *genuinely student-initiated,* and not

27

the product of any school policy which actively or surreptitiously encourages it, the speech is private and it is protected[.]")

Defendant Intervenors contend that Lakeview should not be permitted to allow non-religious groups to use school property during non-school hours yet preclude religious groups from doing the same. The voluntary attendance of students and their parents at religious events like the flagpole and prayer events held on school property during non-school hours appears to be concordant with the First Amendment if other non-religious groups are given similar leeway. The constitutionality of the flagpole and prayer events come into question only because of the attendance and alleged active participation of the school principal and some of the teachers. However, school employees do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Ind. Community Sch. Dist., 393 U.S. 503, 506 (1969). But "the presence of teachers and elementary students together, for prayer, on school premises, albeit during non-instructional hours, is a matter of heightened concern." Daugherty, 116 F.Supp.2d at 910.

There is no evidence before the Court at this point that the principal or the teachers attended the events for the proper purpose of ensuring order and good behavior. Bd. of Educ. v. Mergens, 496 U.S. 226, 236 (1990). Moreover, the Court has before it only limited evidence as to the extent of the teachers' and the principals' participation in these events. Depending upon the extent of school involvement and employee participation, the constitutional analysis may vary. See Coles, 171 F.3d at 377 (citing People of Illinois ex rel. McCollum v. Board of Educ. of Sch. Dist. No. 71, 333 U.S. 203, 210-211 (1948) for proposition that government may not openly or secretly participate in affairs of any religious organizations or groups); Doe v. Duncanville Indep. Sch. Dist., 70 F.3d 402, 406 n.4 (5th Cir. 1995) (observing that if, while acting in their official capacities, school

28

employees join hands in a prayer circle or otherwise manifest approval and solidarity with student religious exercises, they cross the line between respect for religion and endorsement of religion).

The Does have presented evidence that at least principal Marlowe actively participated in these religious events in direct contravention of the instruction of his superior, Dr. Duncan, that school principals could not actively participate in such events and conform to the First Amendment. See Steele, 845 F.2d at 1495 ("Because informal practices of government officials can be as injurious as established policies, the custom or policy need not have 'received formal approval through . . . official decisionmaking channels' to expose it to liability.")  The limited evidence of Marlowe's participation is enough to preclude summary judgment against the Does on this issue. If the principal and teachers actively participated in religious events, a reasonable observer could be led to conclude that Lakeview sponsored or endorsed the religious events, or that the school is excessively entangled with religion.  See Sante Fe Indep. Sch. Dist., 530 U.S. at 313 (observing religious liberty protected by Constitution is abridged when State affirmatively sponsors particular religious practice of prayer).

Because Defendants and Intervenor Defendants have not satisfied the components of the Lemon test on this factual record, they are not entitled to summary judgment with regard to these events.

**C. Thanksgiving Prayer**

James Doe's teacher, Ms. Adamson, taught and led her kindergarten students in singing a Thanksgiving blessing prayer of thanks.  The song was short and consisted of the following: "Thank you, God, for the world so sweet; thank you for the things we eat; thank you for the birds that sing; thank you, God, for everything."

Religious songs and symbols can be used in public schools as long as they are presented in a "prudent and objective manner and only as part of the cultural and religious heritage of the holiday." <u>Florey v. Sioux Falls Sch. Dist.</u>, 619 F.2d 1311, 1316-1317 (8th Cir. 1980). Thanksgiving is an official national holiday that is preeminently part of American history. The day is a public commemoration of the feast held by the Pilgrims and the American Indians to show thankfulness for the harvest. Defendants and Intervenor Defendants assert that Ms. Adamson taught the prayer song to her students in a prudent and objective manner and only in conjunction with her unit on the cultural and religious heritage of the national Thanksgiving holiday.

The Does point out, however, that the DVD given to them at the end of the year does not reveal what Ms. Adamson said to her class about the prayer song as she taught the song to the children. Also, taking as true Jane Doe's testimony for purposes of summary judgment, Ms. Adamson did not notify parents of her students that the prayer would be sung during the Thanksgiving unit, and this allegedly infringed upon the Does' rights as parents to determine whether James Doe would participate in singing the prayer song.

The Court cannot determine facts on summary judgment, and thus, the Court cannot resolve this issue without trial. The Court will need to hear additional evidence in order to decide whether Ms. Adamson's teaching of the prayer song falls within <u>Florey</u> or whether an Establishment Clause issue exists. Defendants and Intervenor Defendants are not entitled to summary judgment on this record at this time.

**D. Christmas Program**

Lakeview's 2005 Christmas program was primarily secular with the presentation of "Twas the Night Before Christmas" and the singing of non-religious Christmas carols. Fact questions exist

as to whether the Does knew in advance that the Christmas program would include a nativity scene and religious Christmas carols. Jane Doe testified that, had she known a nativity scene would be included in the program, her son would not have participated in the program.[8] Ms. Adamson attested to the contrary that she informed parents of students in her class in writing in advance which children were chosen for certain roles, including the roles of Mary, Joseph and the angels. Ms. Adamson also averred that she notified parents of all Christmas carols to be sung, including religious ones.

Many courts have grappled with the issue of whether a nativity scene may be displayed alone or in conjunction with other secular symbols of the Christmas holiday. See e.g. Allegheny County, 492 U.S. at 598-602 (observing the "government may acknowledge Christmas as a cultural phenomenon, but under the First Amendment it may not observe it as a Christian holy day by suggesting that people praise God for the birth of Jesus."); Florey, 619 F.2d at 1316-1317. The physical setting of the nativity scene as displayed is critical to the determination of whether it "supports and promotes the Christian praise to God that is the creche's religious message." Allegheny County, 492 U.S. at 600. The Court will not lengthen this already lengthy opinion by discussing the nativity cases at this premature stage. The Court will wait until it has heard the evidence at trial before determining the facts and circumstances surrounding the display of the

---

[8]Under established school policy, Number 4.803, the Does had a right to withdraw their child from participation in any event which was in conflict with their own religious beliefs. The parties have not briefed whether the policy itself may be unconstitutional. See Santa Fe Indep. Sch. Dist, 530 U.S. at 312 (noting the Constitution demands that school may not force student to choose between attending school event and avoiding personally offensive religious rituals as the price of resisting conformance to state-sponsored religious practice); Schempp, 374 U.S. at 224 ("Nor are these required exercises mitigated by the fact that students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause.")

nativity scene and whether the nativity scene included in Lakeview's Christmas program violated the First Amendment.

**E. Inspirational CD**

The Court is generally informed as to the circumstances surrounding the playing of an inspirational CD in Ms. Adamson's class on one occasion. The record does not include a copy of the inspirational CD at issue. Thus, the Court is handicapped in determining whether any Establishment Clause violation occurred when Ms. Adamson played the CD for her class. It is doubtful whether any such violation occurred, but the Court will await trial to consider any additional evidence concerning this incident which may impact the Court's constitutional analysis.

## IV.  <u>CONCLUSION</u>

For all of the reasons stated and because Defendants and Intervenor Defendants have not shown their entitlement to summary judgment on the record as it presently exists, the motions for summary judgment will be denied.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE