# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN DOE and JANE DOE, as the<br>Natural Parents and Next<br>Friends of Their Minor Child,<br>JAMES DOE, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:06-0924 |
| THE WILSON COUNTY SCHOOL | ) | Judge Echols |
| SYSTEM; DR. JIM DUNCAN, | ) | |
| Individually and as Director of | ) | |
| Wilson County Schools; WENDELL | ) | |
| MARLOWE, Principal of the | ) | |
| Lakeview Elementary School; | ) | |
| YVONNE SMITH, Assistant | ) | |
| Principal of Lakeview | ) | |
| Elementary School; and JANET | ) | |
| ADAMSON, Teacher at Lakeview | ) | |
| Elementary School, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiffs John Doe and Jane Doe, on behalf of their son James Doe,[1] allege that Lakeview

Elementary School ("Lakeview") in the public Wilson County School System engages in a pattern

and practice of endorsing religious activities and particular religious beliefs. Plaintiffs do not

oppose the rights of students to pray at school or to express their religious beliefs. Rather, Plaintiffs

allege they are offended and injured by Lakeview's repeated promotion and endorsement of

Christianity. They seek permanent injunctive relief to preclude Defendants from continuing to

---

[1]The Does proceed by pseudonym in accordance with the Magistrate Judge's Protective
Order (Docket Entry No. 8).

1

engage in a pattern and practice of endorsement of religious activities and particular religious beliefs.

The Court presided at a bench trial held on December 12 and 13, 2007. At the conclusion of the trial, the Court asked counsel for the parties to submit proposed findings of fact and conclusions of law. Having carefully reviewed the post-trial submissions of the parties, the trial transcript, the joint stipulated facts, the supplemental joint stipulated facts, and the trial exhibits, the Court now enters its Findings of Fact and Conclusions of Law. To the extent the parties' proposed findings of fact and conclusions of law have not been adopted or are different from those now entered by the Court, the parties' proposed findings and conclusions are hereby rejected.

## I. <u>FINDINGS OF FACT</u>

Lakeview is located in Wilson County, Tennessee, and is part of the Wilson County School System. The school has classes from kindergarten through fifth grade. Students are typically 5 to 12 years of age. The school day at Lakeview begins at 7:15 a.m. and ends at 2:15 p.m. Except for a short-lived chess club, there have been no student clubs or teams at Lakeview. No students asked Lakeview administrators to start a club or organization.

Plaintiffs John and Jane Doe are the parents of James Doe, born December 30, 1999, who attended kindergarten at Lakeview during the 2005-2006 school year. James Doe's assigned teacher was Janet Adamson ("Adamson"). Jane Doe is Jewish and John Doe is Christian. During all material times, the Does were homeowners in Wilson County, Tennessee and paid property taxes in the county. The Does purchased their residence in Wilson County in order to enroll their son, James, at Lakeview. The Does researched several schools, including Lakeview, before buying property. John Doe's research did not indicate that Lakeview had a reputation as a religious school.

Prior to his enrollment at Lakeview, James attended the Baptist Church Child Enrichment Center daycare program. Jane Doe did not object to sending James to the Baptist daycare because John Doe attended the Baptist Church. The Does did not experience any injury by placing James in the Baptist Church daycare program because they chose to place him there for religious instruction. The Does object "if somebody chooses to religiously train [James] on their own." (Trial Tr. at 192.) The Does have a son younger than James who was preschool age in 2005-2006. John Doe's oldest son attended Mt. Juliet Christian Academy in the 2005-2006 school year.

At all material times alleged in the Complaint, Dr. Jim Duncan ("Duncan"), Wendell Marlowe ("Marlowe"), Yvonne Smith ("Smith"), and Adamson were employees of the Wilson County School System/Wilson County Board of Education ("the System" or "the Board"). Dr. Duncan, the Director of Wilson County Schools, retired in December 2006. The Court substituted Dr. Duncan's successor, James M. Davis, as a Defendant in his official capacity as the current Director of Wilson County Schools. (Docket Entry No. 65.) Marlowe served as Principal of Lakeview from 1986 through 2006 when he was transferred to a position as principal for a middle school in Wilson County. Many Lakeview parents were aware that Marlowe served for 12 years as an elected Wilson County Commissioner. (Joint Ex. 2F at 3; Joint Ex. 2G at 6.) Smith is the Assistant Principal of Lakeview. She has held that position for the last five to six years. Adamson has been a kindergarten teacher at Lakeview for 23 years.

The Intervenor-Defendants, James and Jennifer Walker ("Walker" or "Intervenor") and Doug and Christy Gold ("Gold" or "Intervenor"), are parents of children who attended Lakeview during the 2005-2006 school year. The Golds have two children who currently attend Lakeview in third grade and kindergarten. The Walkers have two children who currently attend fourth and fifth grade at Lakeview. Intervenors are not school system employees.

**A. Board policies**

The Board has a written policy, Number 3.206 effective June 3, 2004, which allows school facilities to be used for public, governmental, charitable, civic, recreational, cultural, and other purposes as approved by the Board when such facilities are not in use for school purposes. (Joint Ex. 1c.) Among other things, the policy provides that "[s]tudent clubs and activities, parent teacher organizations, and other organizations affiliated with the schools shall be permitted use of school facilities without charge[.]" The policy further provides that the Board "will approve and periodically review a fee schedule for the use of school facilities by community or civic organizations and other non profit, recreational, religious, political, or philosophical groups." (Id. at 2.) However, "[w]hen it is clearly indicated that the facilities are utilized for activities related to the school program, no rental fee shall be charged for such usage." (Id.) All non-school activities must be under adult supervision, approved by the building principal, and "[i]n all cases, an assigned school employee must be present." (Id. at 1.) The policy also provides that "[g]roups receiving permission for building use are restricted to the dates and hours approved and to the building area and facilities specified, unless requested changes are approved by the principal[.]" (Id.)

The Board has another written policy, Number 1.806 effective June 3, 2004, governing the advertising and distribution of materials in the schools. (Joint Ex. 1b.) This policy, among other things, provides that "[c]ommunity, educational, charitable, recreational and other similar civic groups may advertise events pertinent to students' interests or involvement. Such advertisement, including the distribution of materials, shall be subject to any procedures related to time, place and manner established by the principal[.]" (Id.) The policy further provides that the "principal shall screen all materials prior to distribution to ensure their appropriateness." (Id.) The policy allows the principal to prohibit materials that would likely violate the rights of others or promote activities

4

that "[s]tudents would reasonably believe to be sponsored or endorsed by the school." (Id.) The policy expressly prohibits distribution of political literature to students, to their parents by sending the material home by students, or by placing material directly in teacher mailboxes or lounges. (Id.) The policy further provides that school publications "may accept and publish paid advertising under procedures established by the director of schools." (Id.)

The Board adopted a third policy concerning the recognition of religious beliefs, customs and holidays. (Joint Ex. 1a.) This policy, Number 4.803, effective June 3, 2004, states:

> No religious belief or nonbelief shall be promoted by the school system or its employees and none shall be belittled. All students and staff members shall be tolerant of each other's views. The school system shall use its opportunity to foster understanding and mutual respect among students and parents, whether it involves race, culture, economic background or religious beliefs. [footnote 1 omitted] In that spirit of tolerance, students and staff members shall be excused from participating in practices which are contrary to their religious beliefs.

> RELIGIOUS HOLIDAYS

> Observance of religious holidays [footnote 2 omitted] shall be as follows:

> 1. The several holidays throughout the year which have both a religious and a secular basis may be observed in the public schools; [footnote 3 omitted]

> 2. The historical and contemporary values and the origin of religious holidays may be explained in an unbiased and objective manner without sectarian indoctrination;

> 3. Music, art, literature and drama having religious themes or basis are permitted as part of the curriculum for school sponsored activities and programs if presented in a prudent and objective manner and as a traditional part of the cultural and religious heritage of the particular holiday;

> 4. The use of religious symbols that are part of a religious holiday are permitted as a teaching aid or resource, provided such symbols are displayed as an example of the cultural and religious heritage of the holiday and are temporary in nature[;]

5

5.	The school district's calendar shall be prepared so as to minimize conflicts with religious holidays of all faiths.

(Id.) [2]

As Director of Wilson County Schools, Duncan understood his role was to balance the free exercise rights of students and teachers in light of the Establishment Clause and to enforce school board policy to the best of his ability. During regular principals' meetings, which Marlowe attended, Duncan discussed school district policy concerning First Amendment issues.

---

[2]Footnote 1 to this policy cites Tenn. Code Ann. § 49-6-2901 to 2906, a chapter known as the Tennessee Student Religious Liberty Act of 1997. These statutes express the state legislature's desire to permit student religious speech in public schools to the same extent as student non-religious speech and to set forth guidelines for the exercise of student religious speech.

Section 49-6-2904(b) states that students may pray in public school vocally or silently, alone or with other students; express religious viewpoints; speak to and attempt to share religious viewpoints with other students; and possess or distribute religious literature subject to reasonable time, place and manner restrictions; and be absent to observe religious holidays and participate in religious practices, all to the same extent and under the same circumstances as non-religious speech so long as the activity does not infringe on the rights of the school to maintain order and discipline, prevent disruption of the educational process, and determine educational curriculum and assignments; harass other persons or coerce other persons to participate in the activity; or otherwise infringe on the rights of other persons.

Section 49-6-2905 expressly states that "[n]othing in this part shall be construed to affect, interpret, or in any way address the establishment clause[,]" and the specification of religious liberty or free speech rights in the chapter "shall not be construed to exclude or limit religious liberty or free speech rights otherwise protected by federal, state or local law."

Section 49-6-2906 provides: "Nothing in this part shall be construed to support, encourage or permit a teacher, administrator or other employee of the public schools to lead, direct or encourage any religious or anti-religious activity in violation of that portion of the First Amendment of the United States Constitution prohibiting laws respecting an establishment of religion."

Footnote 2 of the policy cites Florey v. Sioux Falls, 619 F.2d 1311 (1980), and Washegesic v. Bloomingdale Pub. Sch., 813 F.Supp. 559 (1993), cases about which the Court will say more later in this opinion.

Footnote 3 of the policy cites Tenn. Code Ann. § 49-6-3016, which provides in part that "Thanksgiving Day and December 25 are set apart as holidays for all the public schools[.]"

6

Duncan delegated to Marlowe the daily responsibility for the supervision of Lakeview School, and Duncan trusted Marlowe to do a good job. Duncan believed that Marlowe made an effort to comply with Board policy on First Amendment issues. Duncan did not review each and every request to place information in the Lakeview Parent Teacher Organization's ("PTO's") Eagle Eye newsletter, and he was not aware that any teacher, principal, or school within the district promoted a religious agenda or tried to proselytize students.

Plaintiffs did not present any evidence concerning the Wilson County School Board, its members, any prior incidents concerning religion in the Wilson County Schools addressed by the Board in the past, or the Board's knowledge of and/or involvement in the events leading to this lawsuit, if any.

### B. Volunteer teacher assistants

Many Lakeview parents actively volunteer at the school, and it is common to see parents at Lakeview during school hours. The school administration is proud of and encourages the parental involvement at Lakeview. Volunteer teaching assistants work in classrooms alongside students under the direction of teachers. Volunteer parents do not assign grades, they do not discipline students, they do not have access to confidential student academic testing or behavioral information, and they do not participate in faculty and staff meetings. Lakeview policy requires all visitors to the school, including volunteer parents, to sign in and out at the main office and to wear a visitor's badge while present in the school. Lakeview students are taught to respect their school principals, teachers, and volunteer parents.

Jane Doe served periodically as a volunteer teacher assistant in Adamson's kindergarten classroom when her son was a student at Lakeview during the 2005-2006 school year. In December 2005, at the invitation of Adamson, Jane Doe made a presentation to the kindergarten class about

Hanukkah. Doe displayed a menorah to the children and provided Hanukkah bread, cookies, and gelt. She read to the class from a book about Hanukkah and described the significance of the "miracle of candles" and the origins of the celebration. In Doe's view, Hanukkah is not a religious holiday and therefore she was willing to make the presentation about Hanukkah in Adamson's class. Doe felt that her presentation was not overtly religious.

Jennifer Walker is a volunteer teacher assistant. On average, she volunteers approximately ten (10) days a month at Lakeview, and she can be seen in the school hallways quite often. Also, she is a member of the Lakeview PTO which meets after school hours once a month. Walker is a Christian who believes it is important to communicate her faith and live it privately and publicly. She believes that Lakeview teachers who are Christian should be allowed to live out their faith in front of their students; in other words, teachers should be allowed to exhibit kindness and courtesy, smile, and "have a light about them that comes from their faith in all walks of life. They should not have to cut that off when they walk into the school doors." (Trial Tr. at 61.)

Christy Gold is also a volunteer teacher assistant and member of the Lakeview PTO. She volunteers during class time approximately two (2) days a week for a total of five (5) hours. She helps with the Accelerated Reader bookstore, the Smart Program, the fall festival and other fundraisers, and she performs the annual PTO audit. Gold is a Christian who believes that prayer is an important component of her faith and, like Walker, she believes that it is important for Christians to participate in their children's education and communicate their faith to their children and to others.

### C. Praying Parents

#### 1. Organization and meetings

A small group called the "Praying Parents" has been active at Lakeview for ten (10) years. Beginning with the 2002-2003 school year, Jennifer Walker assumed the role of leader and organizer of the Praying Parents. Christy Gold started attending Praying Parents in 2004. Walker and Gold spend more time at Lakeview as volunteer teacher assistants than they do as members of the Praying Parents.

The Praying Parents publicly describe their activities on an Internet website as follows:

> "Praying Parents" is a group of Lakeview parents who meet once a month to pray for our school, faculty, staff, and children. We pray for specific needs as well as for school-related issues. We also try to provide occasional "treats" for our faculty and staff to remind them that we are praying for them. Praying Parents is not affiliated with any organization, nor do we promote a political agenda. We're just a group of parents who want to make an investment in our children's school through prayer.

(Joint Ex. 7.) The Praying Parents group is open to all religious faiths. Activities of the group are financed entirely by private parties, and Lakeview School does not provide the group with any funding. Groups like the Praying Parents exist at other schools in Wilson County, but Lakeview's Praying Parents group is not affiliated with any other similar organizations.

During the 2005-2006 school year, the Praying Parents met at Lakeview on the first Friday of every month from 7:15 to 8:15 a.m., which is the first hour of the school day. The group met in an area of the school cafeteria that was partitioned off from any other activity, and the cafeteria doors were closed. The meeting location was not near any of the classrooms. No school administrators, teachers, staff or students attended Praying Parents meetings. The group did not encourage Lakeview personnel to attend meetings. No member of the Lakeview staff directed the

Praying Parents to engage in any specific type of religious activity. Neither Jane nor John Doe attended a Praying Parents meeting.

The Praying Parents prayed for students only if the students' parents requested prayer. If teachers specifically requested prayer, the Praying Parents prayed for those teachers during the meeting and then afterwards one or more Praying Parents walked to the teachers' lounge and placed notes in the teachers' mailboxes to let the teachers know that the Praying Parents group prayed for them. Students are not allowed to go into the teachers' lounge, so students do not have access to teachers' mailboxes. Three or four times during the school year the Praying Parents provided treats for the teachers and staff in the teachers' lounge to encourage them and to let them know that the Praying Parents prayed for them. Twice a year, the Praying Parents provided brunch or lunch for the teachers and staff in the teachers' lounge. The Praying Parents did not provide treats or lunch for students. At the end of Praying Parents meetings, members of the group left the school, went into the teachers' lounge to place prayer response cards in teachers' mailboxes, or passed through the hallways to attend another school activity or volunteer in their children's classrooms.[3]

The Court finds that Marlowe was aware that some members of Praying Parents sometimes went into the teachers' lounge after their monthly meeting to leave notes and flyers in the mailboxes

---

[3]On the issue of whether Praying Parents members had access to other parts of the school following their meetings, Marlowe testified twice in what the Court finds to be a somewhat confusing or contradictory manner.

During the Plaintiffs' case, Marlowe testified that, once a Praying Parents member signed in to attend the Praying Parents meeting in the cafeteria, that member could access the teachers' lounge after the meeting and it was possible the member could be seen walking through the school hallways after the Praying Parents meeting if that member was going to be involved in a school-related activity. (Trial Tr. at 91.) During the defense case, Marlowe testified that, once the Praying Parents group completed a meeting, the members "were to leave the building in an orderly fashion, without going to classrooms, unless they then signed in as a parent helper or teacher helper for that day." He further testified that, to the best of his knowledge, he made these restrictions known to the members of the Praying Parents. (Trial. Tr. at 257.)

10

of the teachers and staff and that some members would leave the meeting to go to classrooms where they served as a volunteer teacher assistant or helper. This finding is consistent with Walker's testimony, which confirmed that often she would go to the teachers' lounge and/or to her child's classroom to volunteer immediately after a Praying Parents meeting. Walker stated she did not know if Marlowe was aware that she went to the teachers' lounge after a Praying Parents meeting because he never spoke with her about it. (Trial Tr. 31-33.) The Court finds that Marlowe approved of this access practice.

Marlowe's policy was to allow groups not affiliated with the school to meet during instructional time if the meeting could occur without disruption to students, teachers, or the school program. Because the Praying Parents group met his policy criteria, Marlowe allowed them to meet in the cafeteria during school hours. Marlowe knew that the purpose of the group was prayer. In fact, he supported the prayer activities of the Praying Parents and he asked them to pray for him. Marlowe received prayer response cards in his school mailbox telling him that the Praying Parents had prayed for him.

No other group, religious or non-religious, asked Marlowe for permission to meet on a regular basis during the school day. If Marlowe had been asked to grant such permission, he would have allowed an outside group to meet at Lakeview during school hours if the meeting would not disrupt students, teachers, or the school program. Marlowe did allow groups like county sheriffs and county commissioners to meet at Lakeview during the school day on particular occasions when he was asked to allow such meetings. Until the events underlying this lawsuit, Marlowe did not receive any complaints about the Praying Parents group meeting at Lakeview once a month during the first hour of instructional time.

Beginning with the start of the 2007-2008 school year, the Praying Parents were given a choice to meet at the school during non-school hours or to meet at a nearby church building. The group chose to meet at the church building.

### 2. Praying Parents communication through flyers

During the 2005-2006 school year, the Praying Parents members advertised the time of their group meetings to Lakeview parents by placing flyers in the teachers' mailboxes once a month. The group intended that the teachers would distribute the flyers to their students, who would take them home to their parents. Teachers in the primary grades placed class assignments, school announcements, and other notices like the Praying Parents flyers in individual student folders and sent them home with students. Teachers instructed the children that the materials in their student folders were intended for their parents, that they should give the folders to their parents, and that they should not open the folders themselves. Teachers in the upper grades distributed similar materials directly to students, who carried them home in their backpacks.

Although a kindergartener in 2005-2006, James Doe had begun to learn to read. Jane Doe alleges on the ride home after school, James often pulled out his student folder and read the notices aloud to his mother as she drove. Therefore, according to Jane Doe, James Doe learned about the Praying Parents meetings by reading flyers in his student folder.

Marlowe did not know that the Praying Parents group was going to put their flyers in teacher and staff mailboxes until he received such a flyer in his mailbox. Marlowe was aware thereafter that the Praying Parents placed flyers in the teachers' mailboxes. Walker showed the flyers to Marlowe, and he asked her to change "quite a few things." (Trial Tr. at 67.) Walker testified she received a variety of flyers that had been placed in her children's folders by different non-school organizations, including the PTO, West Wilson basketball, Boy Scouts, Girl Scouts, Big

12

Brothers/Big Sisters toy drives, and the Wilson Bank & Trust In-School Banking Program. (Int.-Def. Exs. 3-5.)

The central office of the Wilson County Schools did not know about or approve the Lakeview Praying Parents flyers that were distributed to students, but it did specifically approve of the distribution of flyers to students for certain non-school activities, including the Halloween in the Park event, cheerleading, modeling, baton twirling, tumbling, and modern dance classes at the community center, a basketball league at the Tulip Grove Baptist Church, and Little League. (Pl. Exs. 1-4.) Students were required to obtain parental consent to participate in school and non-school activities.

Since the 2006-2007 school year, the Director of Schools must approve all flyers to be distributed to students, including those of the Praying Parents group. All such flyers are now made available in the Lakeview School office for students to pick up if they want them. Students may make flyers for the "See You At The Pole™" and "National Day of Prayer" events and distribute them at school to other students.

### 3. Praying Parents communication through the "Eagle Eye"

During the 2005-2006 school year, the Praying Parents group also communicated with others through the PTO monthly newsletter, the "Eagle Eye." The Eagle Eye routinely included information about school-related events and activities, such as skate nights and fund-raisers sponsored by Kroger, Publix, and Papa John's Pizza, as well as advertisements by various merchants and for various non-school activities offered to Lakeview students or parents, such as Tae Kwon Do classes, counseling classes, and others. (Joint Exs. 2A-J.) Teachers placed copies of the newsletter in the student folders or gave them directly to the older students to take home.

13

All but the first and last of these monthly Eagle Eye issues published during the academic year included an advertisement for the Praying Parents group. These ads ordinarily mentioned the date, time and purpose of the group's meetings, directed any interest or questions to Walker, and provided Walker's personal telephone and email contact information. The ads also included the logo of the Praying Parents, an emblem depicting a pair of praying hands. (Joint Exs. 2A-I.) To the Does, praying hands signify Christianity. The Eagle Eye included a larger advertisement in the April 2006 edition. The advertisement announced both a Praying Parents group meeting and the National Day of Prayer, an event which will be discussed in more detail below. (Joint Ex. H.)

The PTO paid for the publication of the Eagle Eye, not Lakeview School. However, the Eagle Eye was an important communication channel for the school and it was distributed to students during school hours to take home to their parents. Marlowe exercised a small amount of editorial control over the Eagle Eye, although he acknowledged that he carried ultimate responsibility for the publication's content. He did not review each issue of the Eagle Eye prior to its publication and distribution.[4]

During the 2004-2005 school year, the year before James Doe started school, Walker wrote six articles that were published in the Eagle Eye. In the February 2005 newsletter Walker's article appeared on the front page and was entitled, "Prayer Makes a Difference!" (Joint Ex. 10.) The article included a poem written as a prayer by a Lakeview parent, which closed with the words, "In the Name of Jesus, Amen." (Id.) Walker asked readers to place the "prayer-poem in a visible spot

---

[4]Marlowe also prepared a newsletter entitled "From the Principal's Desk" that was sent home with students every month to six weeks. A sample issue of the newsletter shows that Marlowe discussed both school and non-school related topics such as fall break, discretionary absences, Red Cross donations, Tae Kwon Do classes after school, and fund-raisers. (Int.-Def. Ex. 2.) There is no evidence that Marlowe discussed Praying Parents activities in any of his newsletters.

and use it as your daily prayer over your children." (Id.)  Marlowe did not review this edition of the Eagle Eye before it was distributed.

Upon seeing Walker's article in the February 2005 Eagle Eye, a Lakeview parent, Neil Spencer, wrote a letter to Marlowe, copied to Duncan, complaining about the article on the front page of the "*Lakeview Eagle Eye* school newsletter." (Joint Ex. 9.)  Spencer expressed his opinion that "[t]his type of proselytizing by a public school is highly inappropriate[,]" and he asked the staff at Lakeview to refrain from including religious material in future newsletters, school communications and programs.  (Id.)

At trial Spencer testified that he sent the letter to Marlowe and Duncan because he was offended by what he felt to be the promotion of Christianity at Lakeview.  Among the things he objected to were the display of the Ten Commandments in a hallway near the school office where students could see that display but no other historical documents; the playing of contemporary Christian music in his child's classroom during the 2000-2001 school year; the inclusion of contemporary Christian music in the annual school Christmas program; and the Gideon Society's distribution of a Bible to his child during history class.

In a responsive email to Spencer, Marlowe stated that he was not responsible for the contents of the Eagle Eye and that Spencer, as an adult, "should know what to ignore." (Trial Tr. 227-228.)  Marlowe copied Duncan on his email.  Duncan did not make his own response to Spencer.  Thereafter, Marlowe called Spencer to discuss the content of the letter, but they did not reach any agreement on how religious activities should be handled at Lakeview.  Spencer did not push the subject any further because his child finished her education at Lakeview in the spring of 2005.

Beginning with the 2007-2008 school year, the PTO no longer includes any notices or articles in the Eagle Eye which do not relate directly to students and their activities.

#### *4. Praying Parents communication through posters and a website*

To advertise the meeting time and place of Praying Parents group meetings, Walker tacked up laminated posters in the school foyer and on the school doors once a month prior to the meeting. Walker stated her posters were placed in the same areas where other non-school organizations such as Cub Scouts and Big Brothers/Big Sisters put up their notices at the school.

Lakeview has a website which was maintained by Adam Bannach, a third grade teacher at the school. During the 2006-2007 school year, <u>after</u> the Does removed their son from school, Walker asked Bannach, her daughter's teacher, to install a link on Lakeview's school website to the Praying Parents group's webpage. Walker did not ask Marlowe for permission to install the link. Walker provided Bannach with information about the Praying Parents group, along with the dates of their meetings. Bannach created a webpage from that material and installed a link on the Lakeview website. (Joint Ex. 7.) Walker prepared only the bottom half of the webpage, and Bannach prepared the rest of it.

Marlowe's policy was to allow links or information to be posted on the school website so long as the material was relevant to school activities, was not disruptive, did not interfere with school purposes, and "was information that I felt like was something that the community would want to hear[.]" (Trial Tr. 122-123.) Marlowe was aware of the link to the Praying Parents website and allowed it because it satisfied his policy. He was not asked by any other outside group to place a link on the school's website, but he would have allowed it if the link met his policy.

The school website also contains a monthly calendar which shows school activities, national holidays, meetings of the Praying Parents group, the National Day of Prayer, and non-school community events.

### 5. *Praying Parents involvement in a note to a student*

On a day when Jane Doe was volunteering at Lakeview, students in Adamson's class left the classroom to attend a special event in the gym. While the classroom was empty, Doe testified she worked in the hallway, and was approached by Walker who asked her to give Adamson a prayer note for a student. Walker denies that she did this. According to Assistant Principal Yvonne Smith, there is no record in the school's visitor log that Walker visited the school on the day of the special event, the day Doe claims Walker gave her the note for a student.

Stacey Joyce is a parent volunteer at Lakeview and a member of Praying Parents. Neither she nor Christy Gold ever observed a Praying Parents member enter a classroom to pass a note to a student. According to Adamson, on one occasion, a parent entered her class while the students were busy with various activities and gave her a note to put in a child's student folder. Adamson knew that the parent who asked her to pass the note was a close friend of the family of the child for whom the note was intended, and Adamson was aware that the child's sibling was ill. Adamson did not know whether the parent was a member of the Praying Parents group. Adamson did not read the note and has no knowledge of its exact message. Adamson did not discuss the activities of the Praying Parents with any students, either during or after school, other than her own daughter, who is a Lakeview student.

Marlowe learned that on one occasion a member of the Praying Parents group went into a classroom during school hours when the students were not present to pass a prayer response card to a student. Afterwards, Marlowe mentioned to the Praying Parents group "that it would not be appropriate for Praying Parents members to enter the classroom with the intentions of giving out any of their material." (Trial Tr. at 91.)

17

The Court finds that, prior to this incident, Marlowe did not provide adequate policy guidance to the Praying Parents group about interactions with students. Based on the testimony of Doe, Adamson, and Marlowe, the Court finds that on one occasion a Praying Parents member went to Adamson's classroom for the purpose of giving her a note to put in the folder of one of her students. It is not material which Praying Parents member passed the note to Adamson.

**D. See You At The Pole™ event**

In September 2005 James Doe took home a flyer in his student folder promoting the national "See You At the Pole™" event at Lakeview (hereinafter "the event"). The Does allege that the event is religious in nature. Such events have been conducted at Lakeview with Marlowe's consent since 2002. Marlowe and some Lakeview teachers attend the event on an annual basis.

To fulfill its purpose of involving students in prayer, the event takes place at the flagpole on school grounds. The Internet website for this national event describes the activity as a "student-initiated, student-organized, and student-led event." (Pl. Ex. 18 at 5.) However, because Lakeview's students are 12 years of age or younger, Walker and the Praying Parents group organized the September 21, 2005 event.

The Praying Parents group promoted the event by placing multiple copies of the flyers in the teachers' mailboxes with the intent that the teachers would put them in their students' folders and backpacks so they would take them home to their parents. The event also was promoted by an ad in the Eagle Eye, and the same ad for the event gave notice of the next regular meeting of the Praying Parents group. (Joint Ex. 2B at 2.) Interested families made posters to promote the event, and Walker tacked up the posters in the hallways of Lakeview. Lakeview's sound system, which was purchased and given to the school by the PTO, was used at the event with Marlowe's permission, but no school funds were expended on the event. The promotional advertisements did

not state whether student participation in the event was voluntary, required, or subject to parental consent or whether Lakeview endorsed or sponsored the event.

The event occurred on September 21, 2005, at 6:40 a.m. before school hours. Attendees gathered around the flagpole in front of the school.[5] The sound system speakers were pointed away from the school towards Saundersville Road. Some Lakeview students and their parents attended and participated in the event, including the Walkers. Some school teachers and employees were there, but they did not formally lead any of the activity. No one from the school encouraged or pressured others to attend or participate. Marlowe neither encouraged nor discouraged attendance by teachers or other Lakeview employees.

Adamson attends the event annually. In September 2005 she attended with her daughter, who was a kindergarten student. They stood in the area between the flagpole and the school, but Adamson did not participate in leading the activity in any way. When others bowed their heads to pray, she did also. Marlowe attended the event, but he stood closer to the driveway so he could monitor student safety and direct morning traffic as usual. Marlowe bowed his head in prayer when other participants did. Both Marlowe and Adamson attended the event as participants and as supervisors of students.

---

[5]Lakeview School faces south on Saundersville Road. (Joint Ex. 12.) A driveway begins on the eastern side of the property at Saundersville Road, swings across the front of the school, and ends on the western side of the school again at Saundersville Road. Children arriving at or leaving school use the main school entrance, which is situated on the main driveway which runs in front of the school. Every school day, Marlowe made it his practice to be present in the driveway to supervise students arriving by car or bus. Marlowe directed several cars to pull up near the school entrance to drop off students. He and several fifth grade students opened car doors for students. As those cars drove away, Marlowe waved several more cars into place to drop off students. This process expedited traffic and promoted safety. Smith and the teachers ordinarily stayed inside the school to prepare for the school day.

19

At the beginning of the event, some participants said aloud one or two Christian prayers for the school, students, and teachers. The words, "God" and "Lord," were used in the prayers. Bible verses were read and songs were sung. Participants then split up into small groups to pray. Marlowe's testimony that he could not recall if the prayers included the names "Jesus" or "Jesus Christ" lacks credibility. The Court finds it is highly probable that Christian prayers referenced the name of "Jesus" or "Jesus Christ."

Jane Doe and James Doe arrived at Lakeview at approximately 7:00 a.m. Jane Doe parked her car in the parking lot southeast of the school entrance and walked her son through the crosswalk, not far from where the event was occurring near the flagpole, to the school entrance. (Joint Ex. 12.) There were a lot of people in attendance and Jane Doe alleged the sound system was loud. Jane and James Doe observed participants with their heads bowed. A lot of people were saying, "Amen." James was very interested in the activity and Jane Doe had a difficult time directing him toward the school door. Jane Doe recognized Walker, who was holding a Bible, and Marlowe, who had his head bowed. Jane Doe exited the school to return to her car at approximately 7:05 a.m., and the event was still underway. Other school children and parents continued to arrive and passed near the event on their way to school.

The Court finds that the event may have extended past 7:00 a.m., but it ended before school started at 7:15 a.m. Other non-religious groups, on request, also have had access to school property before or after instructional hours.

**E. Thanksgiving unit**

In November 2005, Adamson taught a two-week unit to her kindergarten students on the historical origins and traditions of the Thanksgiving holiday. Adamson provided a weekly calendar of activities to her students' parents, which included notice of her annual Thanksgiving unit. The

20

unit's first week focused on the involvement and contributions of the American Indian, and the second week focused on the role and life of the Pilgrims, including their pursuit of religious freedom.

On the last day of the unit during instructional time, the students dressed as American Indians and Adamson dressed as a Pilgrim. James Doe participated in this event. The class prepared a Thanksgiving meal with the assistance of volunteer parents. Jane Doe was not present as a volunteer on that day.

Prior to eating the Thanksgiving meal, Adamson led her class in a prayer of thanks: "For health and strength and daily food, we give thee thanks, oh God. Amen. Amen." The students practiced this prayer the preceding day, and Adamson taught her students that the blessing prayer and song about thanksgiving for health, strength, and daily food was likely similar to that which the Pilgrims would have used on the first Thanksgiving in America. Adamson used a generic prayer because it did not include the words, "Jesus Christ," "Lord," "Savior," or "Allah." At the time the Thanksgiving prayer was said, Adamson did not tell her students that saying the prayer was voluntary, nor did she indicate that any student could be excused from saying the prayer. As the unit is currently taught, the children no longer learn and recite the blessing. Instead, Adamson presents the blessing and instructs the children that the Pilgrims likely said a similar blessing during their first Thanksgiving.

John and Jane Doe learned of their son's participation in the Thanksgiving prayer when they purchased and watched a DVD in June 2006 prepared by the kindergarten teachers to highlight activities of the school year just ended. (Joint Ex. 4.) The Thanksgiving prayer recited in Adamson's class and a similar prayer recited in another kindergarten class were captured on the

DVD.  The Court finds that the Does had prior notice that Adamson would teach a Thanksgiving unit, but not that she and her students would recite a prayer.

Adamson led similar Thanksgiving prayers in her classes in previous years, as did other kindergarten teachers.  Marlowe was aware of the usual Thanksgiving prayer in the kindergarten classes.  He did not approve use of the prayers as part of the curriculum, but he also did not ask Adamson or the other kindergarten teachers to stop including the Thanksgiving prayers.  At no other time or in any other manner are similar prayers or blessings said in Adamson's classroom.  Adamson does not encourage or discourage students from engaging in their own private prayers.

The Golds would find it highly offensive if Lakeview taught about Thanksgiving or facilitated a Thanksgiving event, but failed to explain why the holiday is named Thanksgiving and acknowledge its historical purpose of new religious Pilgrims in America giving thanks to God.

## F.  Christmas program

Each year the five Lakeview kindergarten classes join together to present a Christmas program.  Children are not required to participate and in the past students have not participated due to religious reasons.

The December 8, 2005 Christmas program was promoted in the Eagle Eye.  (Joint Ex. 2D at 2.)  The advertisement said in part:  "Bring your cameras . . . you won't want to miss this delightful play.  Every child participates and it's a wonderful way to get you into the holiday spirit."  (Id.)

In planning for the event, Adamson and the other kindergarten teachers prepared a letter for parents to describe the program.  These letters were sent home with students in their student folders.  (Def. Ex. 1.)  The letter informed parents that the students would present "Twas the Night Before Christmas" and sing eight Christmas carols: "Deck the Halls," "Jingle Bells," "Rudolf," "Up On the

22

Housetop," "Must Be Santa," "We Wish You a Merry Christmas," "Silent Night" and "Away in a Manger." (Id.) The letter also told parents that the teachers had chosen students to play the roles of Santa, the soloist and the reader, but that all other parts were selected randomly by drawing names. Children not assigned a specific part were included in the chorus. The letter stated that the students were practicing the program and that parents should notify the teacher as soon as possible if their child could not participate in the program.

The back side of the letter listed the various speaking or acting parts and described costumes or special clothing to be worn by the participants. These roles included the chorus, reader, soloist, ballerinas, doll toy, Santa, toy soldier, jack-in-the-box, teddy bear, reindeer, Rudolph, mouse, Mary, Joseph, angels, and mom, dad, son and daughter actors. The teachers provided costumes for eleven roles, including Mary, Joseph and the angels. For each student, the teacher circled the role to be filled by that particular child and sent the letter home to that child's parents. James Doe was chosen to be a member of the chorus. The letter did not expressly state that a nativity scene would be portrayed at the end of the Christmas program. However, a reader of the letter could reasonably infer from the listed roles of Mary, Joseph and the angels and the listed carols of "Silent Night" and "Away in a Manger" that a nativity scene likely would be included.

Jane Doe received this note from the school describing the Christmas program and informing her that James would be a member of the chorus. She thought the Christmas program was an official school function, but she did not prohibit James from participating in the program. In fact, John Doe practiced the Christmas carols with his son at home prior to the program.

At school the kindergarten students practiced the Christmas program for nine consecutive school days leading up to the presentation. Practice occurred at school during instructional time.

The program was presented in the school gym after school hours on Thursday night, December 8, 2005, following a PTO business meeting. The popular program was well-attended.

James Doe participated in the Christmas program as a member of the chorus. His parents attended and videotaped the event. (Joint Ex. 3.) Marlowe attended as the school principal. Adamson and the other four kindergarten teachers were present.

A written program given to attendees included the lyrics to only two carols, "Away in a Manger" and "Joy to the World."[6] The school printed the programs, but used funds given to the school by the PTO for such purposes.

The program lasted approximately twenty to twenty-two minutes. The first twenty minutes of the program consisted of a reading of Clement Clark Moore's "Twas the Night Before Christmas" by a student narrator with dramatization of the scenes by students and the singing of secular Christmas carols by the student chorus. At the end of the secular program, the students who were dressed as Mary, Joseph and the angels stepped out of the front row of the chorus to stand near a crib to portray the nativity scene. The audience was invited to join the children in singing the two religious Christmas carols printed in the program. The nativity scene lasted approximately two minutes.

No religions other than Christianity were recognized during the program. Marlowe approved of the inclusion of the nativity scene in the December 2005 program, and he previously approved inclusion of the nativity scene in Christmas programs given in prior years.

The Golds would be offended by the prospect of the school eliminating all religious Christmas carols, acknowledging the historical reason for the holiday and its name, and references

---

[6]Contrary to the initial letter sent home to parents, the students did not sing "Silent Night," but "Joy to the World."

to the birth of Jesus Christ. They believe excluding all references to the birth of Jesus Christ would reflect a denial of a significant historic event and evidence clear hostility toward their religious faith.

## G. CD played in class

During the 2005-2006 school year, one of Adamson's kindergarten students had a sibling who was under treatment for leukemia. As part of a community-wide effort to support the family, a Lakeview father composed and recorded a song with some religious connotation. Copies of the CD were sold to raise funds for the family. The songwriter's child delivered a copy of the CD to Adamson, who had not heard the song. Because Adamson's student, the sibling of the child with leukemia, wanted to hear the song, Adamson played the CD in the classroom and allowed her class to listen to it. At no other time has she played any religious songs or permitted such songs to be played in her classroom. Plaintiffs did not introduce this song into evidence so the Court has not had an opportunity to listen to it.

## H. National Day of Prayer event

The National Day of Prayer is a long-standing national event established by federal statute.[7] The Praying Parents group has organized and promoted the National Day of Prayer at Lakeview with Marlowe's consent since 2003. Marlowe, Adamson and other Lakeview teachers attend the event annually. The Does allege that this event is sectarian in nature and should be excluded from school property.

Prior to the National Day of Prayer event on May 4, 2006, the Golds and the Walkers created flyers that were put in teachers' mailboxes with the intent that the teachers would send the flyers

---

[7]Title 36 U.S.C. § 119 provides: "The President shall issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and meditation at churches, in groups and as individuals."

home with students in their student folders or backpacks. (Joint Ex. 8.) The letterhead or logo on the flyers included a pair of hands brought together in prayer between two American flags. To the Does, the praying hands symbol is clearly indicative of Christianity. Students were encouraged to wear red, white and blue on the day of the event. James Doe took home at least one of these flyers in his student folder.

Walker also promoted the event by placing an advertisement in the April 2006 Eagle Eye newsletter. This Eagle Eye notice also included a pair of praying hands next to a flag and added the line: "Praying Parents will meet from 7:15 -8:15." (Joint Ex. 2H at 8.) Thus, the Praying Parents group was scheduled to meet in the school cafeteria immediately following the National Day of Prayer. Lakeview did not incur any costs for the National Day of Prayer event. The promotional materials did not state whether student participation in the event was voluntary, involuntary, or subject to parental consent or whether Lakeview endorsed or sponsored the event.

Marlowe permitted a voluntary poster contest by the students to promote the event, but he required participating students to create the posters at home. Parents and their children, as private citizens, were solely responsible for making posters, and no school funds or supplies were involved. Marlowe permitted the Praying Parents to display the participating students' posters in the main hallway of the school for about one week. The posters were created on large pieces of paper or posterboard and contained patriotic and religious symbols and content. Some used the words, "Jesus" and "God." Christy Gold separately promoted the National Day of Prayer by hanging up three posters in the school lobby that said, "America Unite in Prayer." James Doe was required to walk through the lobby and hallways where the posters were displayed. Jane Doe saw the posters

in the hallway and recognized their religious symbolism.[8] She was present at Lakeview when the winner of the poster contest was announced over the school intercom system.

Gold organized and led the National Day of Prayer event which was held on May 4, 2006 from 6:40 to 7:00 a.m., before the start of the school day, in an area of the school cafeteria partitioned off from other activities. The doors to the cafeteria were closed during the event. The school's sound system, which was purchased by the PTO, was used with Marlowe's permission. Marlowe testified that one of the reasons he attended the event was to ensure the safety of the speaker system, but the evidence shows he normally attended the annual event. It is more likely that Marlowe attended the event because he wanted to attend as a participant. He neither encouraged nor discouraged attendance by teachers, employees or students.

Approximately 80 parents, students, employees and others attended the National Day of Prayer event. The participants recited the Pledge of Allegiance, sang a patriotic song, and divided into groups to pray for the President, other governmental leaders, and the military. The opening and closing prayers were said aloud by the leaders. The Does and the Walkers did not attend, but the Gold family participated in the event. At least one student in Adamson's class attended, as did other students who were formerly taught by Adamson. Approximately 10 Lakeview teachers attended, but they did not participate in leading the event. Adamson and her daughter attended the event and Adamson bowed her head during prayer as did others. During the prayers, Marlowe also bowed his head, and he recalls that the words "God" and "Lord" were used in the prayers. Although Marlowe and Gold testified that they could not recall if the prayers included the names, "Jesus" or "Jesus Christ," it is highly likely that Christian prayers spoken aloud at this event referred to Jesus.

---

[8]Under current Lakeview policy, such posters may be hung at school by volunteers as long as the posters contain a disclaimer explaining that the event is not sponsored by Lakeview.

Christy Gold offered participants in the National Day of Prayer red, white and blue stickers to wear which said, "I Prayed." (Int.-Def. Ex. 6.) These stickers were not bright yellow as described by Jane Doe. Marlowe wore an "I Prayed" sticker at the event and afterwards to a principals' meeting held at the central office of the Wilson County School System. He removed the sticker once he arrived at the meeting. Marlowe had no objection to students wearing the "I Prayed" stickers and he did not instruct children in attendance at the event to remove them before attending class. Adamson wore an "I Prayed" sticker during class time, although she did not recall how long she wore the sticker. One student in Adamson's class wore an "I Prayed" sticker during class, and Adamson did not instruct the student to remove the sticker. Adamson did not discuss the National Day of Prayer event with her kindergarten students, including James Doe.

When Jane Doe picked up her son from school at the end of the day, she saw some students wearing the "I Prayed" stickers. According to Jane Doe, James Doe cried when he got into the van and told his mother he felt left out because he did not have a "prayer buddy." Marlowe, Adamson, Joyce and Walker testified they have never heard the term "prayer buddy" used at the National Day of Prayer event or at any time in the school by a teacher, school official, or member of the Praying Parents group. Adamson also testified she did not observe any sadness or unusual behavior by James Doe that would have indicated he was upset that day. The Court finds James did observe the "I Prayed" stickers, and he might have been upset because he did not have one, and he expressed those feelings to his mother.

## I. Other Lakeview religious involvement

Marlowe gave permission to the Gideon Society to offer Bibles to Lakeview fifth grade students annually during instructional time. The Ten Commandments are posted in the Lakeview

28

School hallway. Other than the limited testimony given by Neil Spencer about these matters, there was no other evidence about them.

### J. The Does' complaints

The Does did not complain to school administrators about religious events and activities as they occurred. Near the end of the 2005-2006 school year, the Does made an appointment to meet with Marlowe. On the day of the scheduled meeting, however, Marlowe had a conflict because he scheduled a field trip with students, so he asked Smith to meet with the Does. The primary purpose and focus of the meeting between Smith and the Does was James Doe's educational needs, but during the meeting, the Does voiced displeasure about the National Day of Prayer, the See You At The Pole™ event, and the Christmas program. The Does did not specifically voice any complaints or concerns about the Thanksgiving program, Praying Parents group, the flyers sent home in James Doe's folder, the Eagle Eye, the poster contest, the school's website, or any other religion related matter. However, Smith told the Does that Lakeview has a reputation in the community as a religious school with religious teachers, but the school does not teach religion. Smith promised the Does that she would relay their concerns to Marlowe about the religious activity mentioned, and that she would call them afterwards. During subsequent telephone conversation, Smith told Jane Doe that the events the Does complained about had occurred at Lakeview for a number of years and Marlowe had no intention of discontinuing or changing the events.

In the summer of 2006, the Does wrote a letter to Duncan and Marlowe, but they did not receive a written reply from either one of them. In the fall of 2006, the Does went to Lakeview to take their son out of school. Before leaving the building the Does asked to see Marlowe, and he met with them in his office. This meeting became heated and no resolution was reached. As a result, the Does removed James from Lakeview and schooled him at home under the auspices of the

Heritage Christian Academy homeschool program. Duncan spoke with Jane Doe by telephone after the Does had withdrawn James from Lakeview or after they had decided they would withdraw him from school. Because it appeared that the decision to withdraw James had been made, Duncan told Doe, "There may not be anything else I can do if that's your decision." (Tr. at 213.)

The Does testified the Heritage Christian Academy held James' school records but did not provide a curriculum, and they could not find a non-religious school in Tennessee to credential their home school courses. They also state the burden of home schooling James and his younger sibling has eliminated Jane Doe's ability to work outside the home for income that the family needs, and they cannot afford to send their children to a private school. According to the Does, their children miss going to school, socializing and making friends. The Does wish to enroll James and his brother at Lakeview. However, the Does believe that they should control the spiritual influence and development of their children, that Lakeview should be required to eliminate its emphasis on Christianity, and that people of different faiths should be treated equally in a public school. They seek to enjoin the religious events and activity complained about in their Complaint.

Intervenors desire to participate in the Praying Parents group in the future. They would like for Praying Parents to be able to send home flyers like other groups, advertise in the PTO newsletter like other groups, hang posters like other groups and conduct the activities they have conducted in the past, and meet in the school cafeteria to pray. They do not wish to offend or exclude any other groups or religions, but oppose the efforts by the Does to limit or curtail their rights and the rights of their children to pray at school and to participate in recognized historic holiday celebrations, even though they may also have religious meaning to some people.

30

## II. CONCLUSIONS OF LAW

### A. Mootness

Defendants and Intervenor-Defendants initially contend that the Court lacks jurisdiction to grant the Does the injunctive relief they request because of mootness. The Court does not have authority to give an opinion on a moot question or to declare rules of law which cannot affect the matter in issue in the case before the Court. See Church of Scientology v. United States, 506 U.S. 9, 12 (1992). When the issue is no longer "live" or the parties lack a legally cognizable interest in the outcome, the case becomes moot. Brandywine, Inc. v. City of Richmond, 359 F.3d 830, 836 (6th Cir. 2004). Cessation of allegedly illegal conduct is one way a case can become moot, and government officials who voluntarily agree to cease the conduct complained of are generally treated with more solicitude than private parties. Mosley v. Hairston, 920 F.2d 409, 415 (6th Cir. 1990). Nonetheless, the case is not moot if there is a reasonable expectation or a demonstrated probability that the Does will be involved in the same controversy in the future; in other words, there is a reasonable likelihood that the wrong will be repeated. See id. A dispute over the legality of challenged practices may remain because the "defendant is free to return to his old ways." Steele v. Van Buren Pub. Sch. Dist., 845 F.2d 1492, 1494 (8th Cir. 1988). This possibility, "together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." Id. The party claiming mootness carries a heavy burden. Id.

Since the school year at issue, changes have occurred at Lakeview in four areas: (1) all flyers promoting events and activities must be approved by the Director of Schools and distributed to students upon request through the Lakeview office; (2) the Praying Parents group must meet at Lakeview before or after school hours or at a church near the school; (3) the Praying Parents group's weblink on Lakeview's website was removed; and (4) advertisements in the Eagle Eye must

31

relate to school activities. These remedial actions address some, but not all, of the objections raised by the Does. However, no assurances were made in the trial testimony that these new Lakeview policies will not revert to prior practice or that other religious activities will not spring up if the case is simply dismissed for mootness. Additionally, the evidence did not address whether any changes have been made in the content of Thanksgiving and Christmas programs or the manner of conducting See You At The Pole™ and National Day of Prayer events. Thus, Defendants and Intervenor-Defendants have not carried their heavy burden to show a reasonable expectation or a demonstrated probability that the Does will not be involved in the same or a similar controversial, religion-related activity in the future if they enroll their children at Lakeview. Injunctive relief, if granted, would make a difference to the legal interests of the parties. See McPherson v. Michigan High Sch. Athletic Ass'n, Inc., 119 F.3d 453, 458 (6th Cir. 1997) (en banc). Therefore, all the issues in this case have not become moot.

**B. Standing**

Next, Intervenor-Defendants contend that the Does do not have standing to challenge the Praying Parents group meetings or the National Day of Prayer event. Intervenor-Defendants assert that the Does were not directly affected by these activities and therefore, they are not offended observers who can bring a First Amendment challenge.

Parents have a constitutionally protected interest in guiding the religious future and education of their children. Wisconsin v. Yoder, 406 U.S. 205, 232 (1972); Washegesic, 33 F.3d at 683 (observing parents may obtain redress for wrongdoings which directly affect their children); Steele v. Van Buren Public Sch. Dist., 845 F.2d 1492, 1495 (8th Cir. 1988) (same). "[S]chool children who are subjected to unwelcome religious exercises or are forced to assume special burdens to avoid them have standing to complain of an Establishment Clause violation." Daugherty v. Vanguard

32

Charter School Academy, 116 F.Supp.2d 897, 905 (W.D. Mich. 2000); Adland, 307 F.3d at 477 (to meet Article III standing, party must show actual or threatened injury which is fairly traceable to challenged action and substantial likelihood the relief requested will redress or prevent the plaintiff's injury). Plaintiffs carry the burden to show standing, and they must supply a factual showing of perceptible harm. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

Here, the Does allege special burdens on their interests that are direct and personal, not merely hypothetical or abstract; burdens that are clearly sufficient to confer "injured party" standing on them. See id. The Court does not understand the Does to challenge what went on during Praying Parents group meetings that they did not attend and observe; rather, the Does challenge the undeniable presence of the Praying Parents at Lakeview during instructional time with Marlowe's permission and encouragement during the 2005-2006 school year. Praying Parents organized and conducted the National Day of Prayer at the school before classes began, after which Marlowe, Adamson and a classmate of James Doe wore "I Prayed" stickers during instructional time. Praying Parents posted signs and posters, some of them overtly religious in character, in the school foyer and hallways promoting their meetings and religious events like the National Day of Prayer with the apparent approval of the school authorities. James Doe and Jane Doe observed these flyers, posters, signs, and "I Prayed" stickers. James Doe could not avoid the religious posters and signs in the hallways that he was required to walk during the school day, and both James and his mother were present at Lakeview the day the winner of the National Day of Prayer poster contest was announced over the intercom. The Does claim they were offended and injured by such exposures to religious activity at Lakeview. The Court concludes that the Does have produced sufficient evidence that they

33

were directly affected by particular events at Lakeview to establish standing to challenge them.[9] See Washegesic, 33 F.3d at 683.

## C.  Establishment Clause issues

It is very difficult today for many parents and others to accept, much less approve, the current state of the law governing religious freedom under the First Amendment. Prior to 1963, it was not unusual for some public school classes to open with a morning prayer or scripture reading. Prayers were said at all sorts of school gatherings, including holiday celebrations, football games, special events, graduation, and tragedies involving our country or anyone in the school family.

More recent interpretations of the Establishment Clause and Free Exercise Clause of the First Amendment have tightened the reins considerably.  Legal scholars continue to debate these issues, and judges, including those on the Supreme Court, continue to struggle with how to apply the current state of the law governing religious freedom to the facts of a particular case.

Precisely because of the religious diversity that is our national heritage, Allegheny County v. ACLU, 492 U.S. 573, 589 (1989), the First Amendment declares:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const., amend. I.  In the early days of the Republic, perhaps "these words were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism.'" Allegheny County, 492 U.S. 573, 590 (1989) (quoting Wallace v. Jaffree, 472 U.S. 38, 52 (1985)).  The Supreme Court has declared that the Establishment Clause means that "government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental

[9]It is unnecessary for the Court to address whether the Does have taxpayer standing.

34

power to a religious institution, and may not involve itself too deeply in such an institution's affairs." Id. (footnotes omitted).

Both the Establishment Clause and the Free Exercise Clause of the First Amendment operate against the states and their political subdivisions by virtue of the Fourteenth Amendment. Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301 (2000); School Dist. of Abington Township v. Schempp, 374 U.S. 203, 215 (1963). The government is required to maintain strict neutrality, neither aiding nor opposing religion. Schempp, 374 U.S. at 225; Good News Club v. Milford Central Sch., 533 U.S. 98, 114 (2001). "[A]ll creeds must be tolerated and none favored." Lee v. Weisman, 505 U.S. 577, 590 (1992). The Establishment Clause "prohibits government from appearing to take a position on questions of religious beliefs or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" Allegheny County, 492 U.S. at 594 (quoting Lynch v. Donnelly, 465 U.S. 668 (1984)). The Establishment Clause not only limits the religious content of the school's own communications, but it also prohibits the school's support and promotion of religious communications by religious organizations. Id. at 600.

Like the Due Process Clause, however, the Establishment Clause "is not a precise, detailed provision in a legal code capable of ready application." Lynch, 465 U.S. at 678. Rather, the Founders included the Establishment Clause to state an objective. Id. "The line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a 'blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.'" Id. (quoted case omitted).

Local school boards are afforded considerable discretion in operating public schools. Edwards v. Aguillard, 482 U.S. 578, 583 (1987). At the same time, however, the school boards'

35

discretion "'must be exercised in a manner that comports with the transcendent imperatives of the First Amendment.'" Id. (quoting Board of Educ. v. Pico, 457 U.S. 853, 864 (1982)). The Supreme Court has been especially vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Id. at 583-584. This is because

> [f]amilies entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. . . . The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure. . . . Furthermore, "[t]he public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools [.]

Id. at 584. Thus, there are heightened concerns about protecting freedom of conscience from subtle coercive pressure in the elementary schools. Lee, 505 U.S. at 592. "School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" Santa Fe Indep. Sch. Dist., 530 U.S. at 309 (quoting Lynch, 465 U.S. at 688 (O'Connor, J., concurring)). Consequently, the Supreme Court often has been required to invalidate statutes, policies, and practices which advance religion in public elementary and secondary schools. Edwards, 482 U.S. at 584. Our own Sixth Circuit has opined: "The Supreme Court's Establishment Clause jurisprudence has been remarkably consistent in sustaining virtually every challenge to government-sponsored religious expression or involvement in the public schools." Coles ex rel. Coles v. Cleveland Bd. of Educ., 171 F.3d 369, 377 (6th Cir. 1999).

36

Courts currently are required to review government actions challenged under the Establishment Clause using the three-part test set forth in <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971). Under this so-called <u>Lemon</u> test, in order for a governmental practice to satisfy the Establishment Clause, the action must (1) reflect a clearly secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion. <u>Id.</u> at 612-613.

The first prong of the <u>Lemon</u> test focuses on whether the government intended to convey a message of endorsement or disapproval of religion. The purpose prong "asks whether government's actual purpose is to endorse or disapprove of religion.'" <u>Edwards</u>, 482 U.S. at 585 (quoting <u>Lynch</u>, 465 U.S. at 690 (O'Connor, J., concurring)); <u>Coles v. Cleveland Bd. of Educ.</u>, 171 F.3d 369, 384 (6th Cir. 1999). The intention may be shown by promotion of religion in general, or by advancement of a particular religious belief. <u>Edwards</u>, 482 U.S. at 585. Although a totally secular purpose is not required, the secular purpose requirement is not satisfied by the mere existence of some secular purpose, however dominated by religious purposes. <u>Adland</u>, 307 F.3d at 480. And while the Court must accord some deference to Defendants' avowed intention, the Court must distinguish a sham secular purpose from a sincere one. <u>See</u> <u>Santa Fe Indep. Sch. Dist.</u>, 530 U.S. at 308.

The second and third prongs of the <u>Lemon</u> test focus on endorsement or disapproval of religion and government entanglement with religion. If the challenged practice or policy fails any one of the three prongs of the <u>Lemon</u> test, it violates the Establishment Clause. <u>Stone v. Graham</u>, 449 U.S. 39, 40-41 (1980).

The <u>Lemon</u> test has come under criticism, but the Supreme Court has not overruled or abandoned it, and courts continue to apply it. The Sixth Circuit recognizes that the Supreme Court in recent years has applied what is known as the "endorsement" test, which "looks to whether a

reasonable observer would believe that a particular action constitutes an endorsement of religion by the government." Adland v. Russ, 307 F.3d 471, 479 (6th Cir. 2002) (and cases cited therein). The relevant observers are the parents because students cannot participate in activities without their parents' permission. Rusk v. Crestview Local Sch. Dist., 379 F.3d 418, 421 (6th Cir. 2004). A practice "endorses" religion if it conveys a message that religion or a particular religious belief is favored or preferred. Allegheny County, 492 U.S. at 593. While the Sixth Circuit cases "have variously interpreted the endorsement test as a refinement or modification of the first and second prongs [of the Lemon test] . . . a clarification of the first prong . . . and as a modification of the entire Lemon test," see Adland, 307 F.3d at 479, this Court will treat the endorsement test as a refinement of the second and third parts of the Lemon test. See Lynch, 465 U.S. at 690-694 (O'Connor, J., concurring) ("Focusing on institutional entanglement and on endorsement or disapproval of religion clarifies the Lemon test as an analytical device.") Federal courts also apply a "coercion test" which provides that, "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith or tends to do so.'" Lee, 505 U.S. at 587 (quoting Lynch, 465 U.S. at 678). Two "overriding principles can be discerned" from the Supreme Court's school prayer cases: "The first is that 'coercion' of impressionable young minds is to be avoided, and the second is that the endorsement of religion is prohibited in the public schools context." Coles, 171 F.3d at 379.

1. *The activities of the Praying Parents*

The proof before the Court shows that the activity of the Praying Parents group at Lakeview during the 2005-2006 school year, when considered in the totality of the circumstances, violated all three prongs of the Lemon test. The group's primary purpose is revealed by its name, parents who

38

pray, a recognizable religious activity. The overtly religious purpose of the group overshadowed any secular purpose it might have had. Moreover, the effect of the group's predominant religious purpose was to advance Christianity at Lakeview. The Praying Parents group prays for lofty goals, including the safety of their children and other students, the welfare of the teachers, staff, our soldiers, political leaders and our country, but this does not alter the conclusion that its primary activities are religious in nature. The school administration apparently agreed with the group's purpose and activities and did not properly monitor and supervise their activities on school property, and, by allowing these activities, the school tacitly or overtly endorsed the group and its activities. By doing so the school became excessively entangled with the group's religious activities, and abandoned the school's constitutional obligation to maintain strict neutrality towards religion. See Schempp, 374 U.S. at 225; Good News Club, 533 U.S. at 114.

The Intervenor-Defendants do not attempt to articulate a secular purpose of the Praying Parents group. Rather, they insist that they are constitutionally entitled to promote their religious perspective through many forms of expression at Lakeview School and to prohibit them from doing so while other groups are allowed to utilize the same channels of expression would amount to unconstitutional viewpoint discrimination. The Defendants articulate the secular purpose of the Praying Parents group to be the facilitation of parental involvement in the school's educational mission. They point out that the Praying Parents group is non-denominational and welcomes people of all faiths.

Undertaking steps to encourage parents to be involved in their children's education is a laudable goal, and certainly parents have a right to pray for the students. However, this freedom of parents to exercise their religion does not permit a public school through its officials to endorse

39

religion, align itself with religious beliefs or practices, or promote a particular religious organization or its activities.

The record reflects that the PTO was active at the school by publishing the school newspaper, the Eagle Eye, and furnishing volunteer teacher assistants in some of the classrooms. Although members of the Praying Parents group participated in the PTO, the Praying Parents group was a separate organization with a more limited and specific purpose, i.e., to pray regularly for the welfare and needs of their children, other students, faculty, staff and related matters at Lakeview. The organization does not promote a political agenda and membership is open to all religious faiths, but the proof shows that the membership is decidedly Christian and their prayers of praise, thanksgiving and petition are offered to God, usually in the name of his son, Jesus Christ.

The witnesses for the Praying Parents are intelligent, energetic, and articulate with a strong faith that their loving God would hear their prayers, respond to their petitions, and bless the school's efforts to educate and care for their children. Members of the Praying Parents, as Christians, believe they should live out their faith in their daily lives, not just when they attend church on Sunday and other occasions. They do not seek to convert others to their faith, but they wish to be able to exercise their faith publicly, including at the school attended by their children, which is open to other non-school groups. The Praying Parents did not pray for other students, teachers, or staff unless requests were made by the students' parents or the school employee. They did pray for God to bless our country and for the safety of the men and women in the military.

The Praying Parents group was organized at the beginning of the 2002-2003 school year, and it appears its membership activities and influence at the school grew over the next few years. By the relevant 2005-2006 school year, members of the Praying Parents were very involved at Lakeview. The Praying Parents held their monthly meetings in a partitioned area of the school

40

cafeteria from 7:15 to 8:15 a.m., the first hour of the school day. Some members often left the Praying Parents meetings to deliver flyers and prayer response cards to teacher mail boxes in the teachers' lounge and to attend classrooms where they served as teacher assistants. The Praying Parents group helped sponsor or participated in many activities at Lakeview, including the following: Eagle Eye student newspaper, volunteer teacher assistant program, the annual See You At The Pole™ event, the National Day of Prayer, meeting notices and articles, advertisements in the Eagle Eye, providing a link to Praying Parents on Lakeview's internet website which provided information about the Praying Parents group and its meeting dates, access to the teachers' lounge, putting prayer response notes in teachers' mail boxes, communicating with parents by sending information and prayer requests home by teachers placing flyers in student folders and back packs, placing posters in the entrance area and hallways of school advertising meetings of Praying Parents, See You At The Pole™, National Day of Prayer and other Praying Parents affiliated events.

The Court concludes that any secular purpose the Praying Parents group may have had was starkly overshadowed by the group's admitted purpose to live out their faith publicly at Lakeview and to pray regularly for the welfare of their children, students and others at the school. Because of its acceptance and support by the administration and its involvement in so many school activities, the Praying Parents group had a significant presence at the school and a platform from which to assert its Christian values. The effect was to promote Christianity at the school. See Adland, 307 F.3d at 480 (observing that, although a totally secular purpose is not required, the secular purpose requirement is not satisfied by the mere existence of some secular purpose, however dominated by religious purposes).

Moreover, the Lakeview School administration endorsed the activities of the Praying Parents group (and some teachers as well) in the mission to promote Christianity at the school. This is most

41

clearly understood from Assistant Principal Smith's statement to the Does (after they complained about the nativity scene in the Christmas program and the See You At The Pole™ and National Day of Prayer events) that "Lakeview has a reputation in the community as a religious school with religious teachers that does not teach religion." As Walker explained, elementary students, especially the younger ones, do not have the capability to organize and plan events so the Praying Parents group stepped up to perform these functions, execute the events, and carry on its mission at the school. None of the religious activities at issue in this case were initiated, planned and organized solely by students.

Lakeview administration signaled its endorsement of Christian religious activity in several ways as discussed above. In addition, the Ten Commandments were posted in the hallway near the office without any other historic documents, and sometime in the past the Gideons were allowed to distribute Bibles to fifth graders during instructional time. Marlowe and teachers annually attended religious events sponsored by the Praying Parents group and held on school property, such as See You At The Pole™ and the National Day of Prayer. Marlowe, along with some teachers and students, wore "I Prayed" stickers inside the building. Although Marlowe and the teachers may have been present in part to supervise students in accordance with district policy, the proof shows they participated in the event and acknowledged their approval by publicly displaying the "I Prayed" stickers. This telegraphed to believers and non-believers alike their identification with those who gathered to pray on that day. Such religious activity by school authority figures on school property in the presence of young students has an influential effect on such students. See Lee, 505 U.S. at 587; Daugherty, 116 F.Supp.2d at 910("the presence of teachers and elementary students together, for prayer, on school premises, albeit during non-instructional hours, is a matter of heightened concern.")

It is important to note that the Does did not complain about the Praying Parents group or any other religion related matter during the relevant 2005-2006 school year. Rather, at the end of the school year the Does met with Smith and then Marlowe and Duncan to discuss the enrollment of James Doe for the next year. It was during these discussions that some of the offending events during the past year were mentioned, namely the closing scene of the Christmas play which briefly showed the nativity scene, the National Day of Prayer, and the See You At The Pole™ event. Unfortunately, Marlowe and Duncan informed the Does that they did not intend to take any action to address the Does' concerns. When the Does learned that no modifications would be made in school policies and practices to address their complaints and curtail certain Christian related activities, they decided to remove James Doe from Lakeview and file suit for injunctive relief and damages.

The degree of school involvement in religious activity determines the extent of the perceived and actual endorsement of or entanglement with religion. See Santa Fe Indep. Sch. Dist., 530 U.S. at 305. When the evidence is viewed in its totality, the Court finds that during the relevant 2005-2006 school year, the administration allowed the Praying Parents group to become too deeply entangled with its educational pursuits. Most of the Praying Parents group's activities had little or no secular purpose, and they boldly proclaimed their strong Christian beliefs which included public demonstrations of their faith at Lakeview. Lakeview's permission and tolerance gave the impression of endorsement which runs afoul of the constitutional limitations of the Establishment Clause.

This is not to say that every school activity of which the Does complain, standing alone, violated the Establishment Clause. Lakeview may constitutionally allow the Praying Parents group to enjoy the same access to school property and school resources as non-religious groups are allowed. Thus, if non-religious groups are allowed to meet on school property during certain times,

43

have access to teachers' mailboxes, send flyers home with students, and advertise their activities in the Eagle Eye, then the Praying Parents group is entitled to similar access.  See Good News Club, 533 U.S. at 106-107, 114 ("The Good News Club seeks nothing more than to be treated neutrally and given access to speak about the same topics as are other groups."); Rosenberger v. University of Virginia, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."); Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 394-395 (1993) (holding school board could not deny church right to show film on school property where permission was denied solely because film dealt with an otherwise permissible subject from a religious standpoint); Rusk, 379 F.3d at 424; Daugherty, 116 F.Supp.2d at 908.  But Lakeview administrators cannot favor the Praying Parents group and its activities over non-religious groups, give the Praying Parents group special privileges that other groups do not receive, or become so entangled with the Praying Parents group that students and parents believe that the Praying Parents are endorsed or sponsored by the school.  Cf. Good News Club, 533 U.S. at 117 n.7 (distinguishing Schempp which found an Establishment Clause violation where challenged activity occurred  during the school day).

The Board adopted written policies to address at least some of the constitutional issues raised here, but Marlowe, as school principal, exercised the discretion granted to him by Board policies to favor religious activities at Lakeview.  In some cases, Marlowe put into place his own policies which were at odds with the Board's written policies.

For example, Board policy number 3.206 allowed Lakeview School to be used for "public, governmental, charitable, civic, recreational, cultural, and other purposes as approved by the Board" when such facilities were not in use for school purposes.  (Joint Ex. 1c.)  Two aspects of this policy are important here: first, the policy makes clear that Lakeview School could be used for "other

44

purposes," a broad category presumably including religious activity, when the school was <u>not in use</u> <u>for school purposes</u>. Second, the use of Lakeview School for "other purposes," presumably including religious activity, required Board approval. There is no evidence that the Board approved of the Praying Parents group meetings at Lakeview School once a month during the first instructional hour of the day. To compound matters, Marlowe as principal adopted his own school-use policy. He allowed the Praying Parents group to meet during instructional time because in his view the meeting would not disrupt students, teachers, or the school program. Other than the Praying Parents group, however, Marlowe could not identify any other non-school group that met regularly at Lakeview during class time. He attributed this to the fact that no other outside group asked for permission to meet at the school during class time. But even if another outside group had asked Marlowe for permission to meet during school hours and he had granted permission, the same conflict would remain between Marlowe's policy and official written Board policy. The Board did not approve the use of school facilities by the Praying Parents or any other outside group during instructional time. Thus, because the Praying Parents group was the only outside group to meet at the school during class time, a reasonable observer could easily conclude that the school endorsed the Praying Parents' religious activities at the school.

Additionally, Marlowe utilized the discretion granted to him by Board policy number 3.206 to provide the Praying Parents group members with a wide berth at Lakeview. The Board policy stated that "[i]n all cases, an assigned school employee will be present" at the activity on school premises. Marlowe did not assign any school employee to monitor Praying Parents group meetings. Moreover, the Board policy provided that "[g]roups receiving permission for building use are restricted to the dates and hours approved and to the building area and facilities specified, unless requested changes are approved by the principal[.]" (Joint Ex. 1c.) Marlowe permitted Praying

Parents group members to meet during the first instructional hour and then disperse to other parts of the school as they chose, either to leave prayer response cards, flyers or treats in the teachers' lounge or to go to classrooms to volunteer as teacher assistants. Walker and Gold put up posters advertising Praying Parents meetings and religious activities, and Walker herself admitted that she could be seen in the Lakeview halls often. In reality, the Praying Parents members were not restricted to specific dates and hours in their use of the school. When members of a group so closely affiliated with religious activity are seen on a regular basis in the halls of a school, a reasonable observer could conclude that the school endorsed the presence of those members in the school.

The Board also adopted a written policy, Number 1.806, that covered the distribution of flyers at the school. (Joint Ex. 1a.) Among other things, this policy provides that "[c]ommunity, educational, charitable, recreational and other similar civic groups may advertise events pertinent to students' interests or involvement. Such advertisement, including the distribution of materials, shall be subject to any procedures related to time, place and manner established by the principal[.]" (Id.) The policy also states that the "principal shall screen all materials prior to distribution to ensure their appropriateness."[10] (Id.) The principal may prohibit materials that "[v]iolate the rights of others . . . or [s]tudents would reasonably believe to be sponsored or endorsed by the school."

The Praying Parents group was entitled to distribute flyers through the Lakeview flyer forum to the same extent as other outside groups so long as the flyers complied with a Board policy that was viewpoint neutral. However, Marlowe admittedly did not review all flyers before they were

---

[10]The policy does not make clear what is meant by ensuring the "appropriateness" of particular materials. See Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Sch., 457 F.3d 376, 388 (4th Cir. 2006) ("*nothing* in the policy prohibits viewpoint discrimination, requires viewpoint neutrality, or prevents exclusion of flyers based on [the school's] assessment of the viewpoint expressed in a flyer").

distributed to students, including those distributed by the Praying Parents group. He did not know that the Praying Parents group intended to distribute flyers until he received one in his school mailbox. While Marlowe may have made suggestions for the revision of a few Praying Parents group flyers thereafter, representative flyers did not indicate whether the school or the Praying Parents group sponsored the prayer activities promoted in the flyers. (Joint Exs. 8, 11.) The Does felt these flyers violated their rights because the flyers promoted Christian religious activity at the school. Marlowe did not follow Board policy to examine all of the Praying Parents group's flyers to ensure that the religious activity was not sponsored or promoted by the school and they complied with the Board policy before they were distributed. Students and parents receiving the flyers could reasonably conclude that Lakeview endorsed the activities of the Praying Parents because the flyers did not state otherwise.

The Board adopted written policy number 4.803 to address particularly the issue of religion in the schools. This policy is very similar to the one held to be facially constitutional in Florey v. Sioux Falls Sch. Dist., 619 F.2d 1311 (8th Cir. 1980). The opening paragraph of the policy states:

> No religious belief or nonbelief shall be promoted by the school system or its employees and none shall be belittled. All students and staff members shall be tolerant of each other's views. The school system shall use its opportunity to foster understanding and mutual respect among students and parents, whether it involves race, culture, economic background or religious beliefs. [footnote 1 omitted] In that spirit of tolerance, students and staff members shall be excused from participating in practices which are contrary to their religious beliefs.

The evidence shows that Lakeview and the Wilson County school system failed to abide by this policy in more than one way. In its fervor to do good by following its Christian beliefs, the Praying Parents group stepped over the line and Lakeview and Wilson County allowed them to do so. The effect of this inaction by school authorities was to project the image that Lakeview endorsed or promoted Christianity through its entanglement with the Praying Parents. Moreover, when parents

47

like the Does and Neil Spencer complained about the promotion of Christianity at Lakeview, Marlowe and Duncan did not show any tolerance for their religious objections, nor did they use the opportunities presented by parents' complaints to foster understanding and mutual respect concerning different religions. Instead, Marlowe, supported by Duncan, refused to consider any changes at Lakeview that would have resulted in a more neutral and balanced view of religion and promoted an understanding and respect for others' religious beliefs. As a result, the complaining parents felt their religious views were belittled and ignored. The actions of school administrators fostered divisiveness and intolerance, the exact opposite of the policy's goal.

### 2. *The Thanksgiving prayer*

The Board's policy on religious beliefs, customs, and holidays, Number 4.803, permits Lakeview to recognize holidays that have both a religious and secular basis. The policy also provides that the "historical and contemporary values and the origin of religious holidays may be explained in an unbiased and objective manner without sectarian indoctrination[.]"

Thanksgiving Day is a legal public holiday. 5 U.S.C. § 6103. It commemorates American heritage, including the Pilgrims' arrival on the continent and their relationship with the American Indians. Adamson and other kindergarten teachers presented a two-week unit on Thanksgiving, focusing one week on the American Indians and one week on the Pilgrims. The unit culminated in a Thanksgiving meal. Adamson presented a generic blessing prayer as a type of prayer the Pilgrims might have said before the first Thanksgiving meal. Adamson rehearsed the simple prayer and a Thanksgiving song the previous day and it was repeated before the meal the next day. The use of this generic blessing prayer in the context of a class lesson explaining the historical origins of Thanksgiving, which was done in an unbiased and objective manner without sectarian indoctrination, did not offend school district policy or the Constitution.

48

Policy number 4.803 also provides that students "shall be excused from participating in practices which are contrary to their religious beliefs." Adamson provided a weekly calendar of activities to her students' parents, which included notice of her annual Thanksgiving unit. There is no evidence that Adamson and other kindergarten teachers notified parents of students in their classes of a summary of the unit instructions which obviously contained information about the religious Pilgrims praying to thank God for the food that was to be eaten at the Thanksgiving meal. However, it is generally understood that the custom of giving thanks for our provisions and welfare is the basis for our Thanksgiving holiday. Learning about a typical generic prayer which may have been said by the early Pilgrims has both historic and religious overtones. Board policy provides that "students and staff members shall be excused from participating in practices which are contrary to their religious beliefs."[10] The Does were alerted to the Thanksgiving block of instructions and were aware of the cultural history of the holiday. However, pursuant to this policy, parents should have been given timely notice of the teachers' intent to include in the instructions a simple example of a prayer blessing that may have been used by the Pilgrims at Thanksgiving so that parents who wished to have their children excused from participation could request such in advance of the activity. This oversight, standing alone, does not constitute a constitutional infraction.

### 3. The Christmas program

---

[10]The parties do not discuss whether the policy itself may be unconstitutional. <u>See</u> <u>Santa Fe Indep. Sch. Dist</u>, 530 U.S. at 312 (noting the Constitution demands that school may not force student to choose between attending school event and avoiding personally offensive religious rituals as the price of resisting conformance to state-sponsored religious practice); <u>Schempp</u>, 374 U.S. at 224 ("Nor are these required exercises mitigated by the fact that students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause.")

49

Policy number 4.803 permits the celebration of Christmas at Lakeview because the holiday has both a religious and secular basis. The policy allows the use of "[m]usic, art, literature and drama having religious themes . . . as part of the curriculum for school sponsored activities and programs if presented in a prudent and objective manner and as a traditional part of the cultural and religious heritage of the particular holiday." See Florey, 619 F.2d at 1316-1317. The policy also provides that the "use of religious symbols that are part of a religious holiday are permitted as a teaching aid or resource, provided such symbols are displayed as an example of the cultural and religious heritage of the holiday and are temporary in nature." As noted above with regard to the Thanksgiving holiday, policy number 4.803 permits the origin of religious holidays to be explained in an unbiased and objective manner without sectarian indoctrination.

At issue here is the inclusion of a brief two minute nativity scene at the end of a twenty-two minute Christmas program put on at the school by the kindergarten students after school hours following a PTO meeting. The main program included students dressed in secular dress and costumes, secular Christmas carols, literature and drama. At the end of the secular program, students dressed as Mary, Joseph, and angels stepped out of the chorus group of students to stand near a crib to portray the nativity scene and the audience and students sang two religious Christmas carols. Because the kindergarten classes practiced the program during instructional time for nine days prior to the presentation and the kindergarten teachers and school administrators attended the program, the Christmas program was a school-sponsored event.

How the nativity scene is displayed is critical to the determination of whether it "supports and promotes the Christian praise to God that is the creche's religious message." Allegheny County, 492 U.S. at 600. A nativity scene may be displayed as one item among many secular symbols of Christmas and meet constitutional muster. See Lynch, 465 U.S. at 685-686. However, isolating a

50

nativity scene in such a way as to show government solidarity with the Christian faith violates the Establishment Clause. See Allegheny County, 492 U.S. at 598-599.

In this case, in the main secular portion of the Christmas program, students assumed roles with costumes and special clothing, including members of the chorus, the reader, soloist, ballerinas, toy doll, toy soldier, Santa Clause, jack-in-the-box, teddy bear, reindeer, Rudolph, and a mouse. It was much more of an extravaganza with more student participation and fanfare than the rather meager, stark nativity scene placed at the very end. The nativity scene included at the end of the Christmas program was an example of the religious heritage of the holiday and was very limited in duration as compared to the balance of the program. Unlike in the secular presentation, there were no words spoken by the students or narrated by others in the ending portion of the program. The Court concludes that the nativity scene was presented in a prudent, unbiased, and objective manner to present the traditional historical, cultural, and religious meaning of the holiday in America.

Christmas is a national religious holiday, celebrated on December 25. To Christians, the holiday commemorates the birth of a man named Jesus, who was also called Christ, from which the holiday derives its name. The Biblical account of Jesus' birth is that he was born in a crib or manger to mother Mary and father Joseph. This is represented by the nativity scene. This is a recorded historical event, but the birth of Jesus also is the center of the religious faith of Christians.

It could be argued that the nativity scene should have been presented at the beginning of the program or in the middle rather than the end, but the scene would not change, nor would its historical, cultural, or religious significance. Similarly, if the nativity scene was placed at the beginning, it could be argued that it was scheduled first because it was considered most important. Also, even if the audience was invited to join with the student chorus in singing one or two of the six secular Christmas carols such as "We Wish You A Merry Christmas" and "Deck the Halls" at

51

the end of the program, one could argue that the selection of the two religious carols sung by the chorus was somehow inappropriate. In this case, however, John Doe, the Christian father of James Doe, practiced the Christmas carols to be sung in the Christmas program at home with his son without objection.

Each scene of the secular portion of the Christmas program included props, animal and storybook characters, customs or designated dress, songs, narratives, or spoken parts. Those in the audience clapped and took pictures of the participating students as they sang and acted out their parts. The brief nativity scene lasted only two minutes, less than 10% of the program, with no acting, speaking or narrative. Considering the Christmas program as a whole, it was a secular performance with a bit of religious symbolism at the very end to reflect the historic, cultural and religious significance of the Christmas holiday. Taken as a whole, the inclusion of the nativity scene as a part of the program did not offend the Constitution.

### 4. See You At the Pole™ and National Day of Prayer events

The Defendants have not identified any secular purpose supporting the flagpole event. They argue that the Supreme Court has never extended its Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because such conduct takes place on school premises where elementary school children are present, citing Good News Club, 533 U.S. at 116. In fact, Defendants contend, courts have upheld a student group's right to engage in morning prayer at the school flagpole, relying on Westfield High Sch. L.I.F.E. Club v. City of Westfield, 249 F. Supp.2d 98, 118 (D. Mass. 2003).

The Westfield case mentioned only briefly that the school permitted a L.I.F.E. club to meet before school at the flagpole for morning prayer. 249 F.Supp.2d at 102. The critical fact in Westfield was that the religious activities at issue were student-initiated and student-led. Id.;

Chandler v. Siegelman, 230 F.3d 1313, 1317 (11th Cir. 2000) ("So long as the prayer is *genuinely student-initiated,* and not the product of any school policy which actively or surreptitiously encourages it, the speech is private and it is protected[.]")  In the case at bar, no student or student club planned the flagpole event or the prayer event.

Defendant Intervenors suggest that the National Day of Prayer event represents historic traditions honoring our nation's religious history.  They also contend that Lakeview should not allow non-religious groups to use school property during non-school hours yet preclude religious groups from doing the same.

Walker, Gold, and the Praying Parents group planned and led these events on school property with Marlowe's permission.  There is no evidence that any Lakeview teacher or administrator planned, organized, or led these events.  The school did not provide any funds for these events, although the school public address system, purchased by the PTO, was used at both events.  The Praying Parents group absorbed the costs of producing the events.

Several aspects of these events are problematic, however.  First, although the history of our country is steeped in Christianity and religious freedom, the events in question were clearly Christian only, not non-denominational, in character and there is no evidence that the Board approved the use of Lakeview's facilities during non-school hours for the See You At the Pole™ and National Day of Prayer events, as required by Policy Number 3.206.

Second, the flyers and Eagle Eye advertisements created by the Praying Parents promoting the events used a pair of praying hands, a symbol associated with Christianity.  See Lee, 505 U.S. at 588 (observing the use of images identified with a particular religion may foster a different sort of sectarian rivalry than if more neutral images are used).  The announcements in the flyers and the Eagle Eye came from the school and did not indicate a sponsor of the events.  Walker and Gold

posted signs promoting the events in the school hallways. Marlowe permitted a student poster contest to promote the National Day of Prayer. The student posters, which included religious content and symbols, were displayed in the hallways with Marlowe's permission. A reasonable observer could thus assume that Lakeview sponsored the events.

Third, Marlowe, Adamson, and other Lakeview teachers participated in the events. Marlowe and Adamson claimed that they attended in part to supervise students. See Bd. of Educ. v. Mergens, 496 U.S. 226, 253 (1990) (the Equal Access Act permits assignment of a teacher, administrator or other school employee to a meeting for custodial purposes and such custodial oversight of a student-initiated religious group, merely to ensure order and good behavior, does not impermissibly entangle government in day-to-day surveillance or administration of religious activities). They did not speak or lead the group in prayers, but like other participants, they bowed their heads when prayers were offered and wore "I Prayed" stickers during instructional time following the National Day of Prayer. The young students and their parents understandably could have thought that the teachers and school principal were present as representatives of the school and as such their actions were an endorsement of the religious event. Their actions crossed the line of permissible supervision of the students at the event and signaled to others that they supported the Praying Parents who sponsored and participated in these Christian events. See Coles, 171 F.3d at 377 (citing People of Illinois ex rel. McCollum v. Board of Educ. of Sch. Dist. No. 71, 333 U.S. 203, 210-211 (1948) for proposition that government may not openly or secretly participate in affairs of any religious organizations or groups); Doe v. Duncanville Indep. Sch. Dist., 70 F.3d 402, 406 n.4 (5th Cir. 1995) (observing that if, while acting in their official capacities, school employees join hands in a prayer circle or otherwise manifest approval and solidarity with student religious exercises, they cross the line between respect for religion and endorsement of religion). A reasonable observer could conclude

54

that Lakeview sponsored or endorsed the religious events, or that the school is excessively entangled with religion.  See Sante Fe Indep. Sch. Dist., 530 U.S. at 313 (observing religious liberty protected by Constitution is abridged when State affirmatively sponsors particular religious practice of prayer).

School teachers and administrators do not shed their own First Amendment rights to exercise their religion at the school entrance.  Tinker v. Des Moines Ind. Community Sch. Dist., 393 U.S. 503, 506 (1969).  However, Lakeview teachers and administrators may not participate in student-initiated prayers in their official capacities.  Doe, 70 F.3d at 406.  The school must strike a careful balance between the Free Exercise rights of teachers and administrators and the commands of the Establishment Clause.  Where there is tension between the two, Establishment Clause concerns take precedence.  Doe, 70 F.3d at 406 (noting the principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause); Berger v. Rensselaer Central Sch. Corp., 982 F.2d 1160, 1168 (7th Cir. 1993) (free expression rights must bow to the Establishment Clause prohibition on school-endorsed religious activities).

5. *Inspirational song played in Adamson's class*

The Establishment Clause was not violated when Adamson, on one occasion, played an inspirational song which contained some religious connotation.  A Lakeview parent created the song and produced the CD to raise funds to support the family of a child suffering from leukemia.  The child's sibling was a student in Adamson's class.  When Adamson played the song at her student's request, she had not heard the song before and she was not aware of its religious connotation.  Under the circumstances, the Court concludes that no reasonable observer could believe that Adamson or Lakeview endorsed religion by the playing of this song once during instructional time.

55

6.  *Intervenor-Defendants concerns*

Intervenor-Defendants contend that any failure by the Lakeview administration to treat them comparably to non-religious groups would constitute viewpoint discrimination or require the school to engage in content discrimination in a designated public forum.  Their arguments capsulize a fear that Lakeview administrators *may in the future* violate their First Amendment rights if, in an effort to comply with the Establishment Clause or this Court's directives, school administrators allow the pendulum of church-school equilibrium to swing too far the other way and discriminate against the exercise of their religious freedom.

There is no justiciable controversy before the Court concerning alleged violation of the constitutional rights of the Intervenor-Defendants.  They produced no evidence of a constitutional injury inflicted upon them by the Lakeview school administration which the Court is called upon to address at this time.  There is no evidence that Lakeview administrators currently favor non-religious groups over the Praying Parents group, or that Lakeview administrators preclude the Intervenor-Defendants from participating in any activity on the same basis as other individuals or groups.

The evidentiary record contains some limited information about policy changes that occurred at Lakeview after this lawsuit was filed.  Since the 2006-2007 school year, Lakeview's new principal has prohibited the Praying Parents group from placing their flyers directly into teachers' mailboxes for distribution.  Rather, under current policy, the Director of Schools must approve all flyers proposed to be distributed to students by any group, religious or not, and all flyers are made available in the school office for students to pick up if they want them.  Students are allowed to make flyers for the "See You At The Pole™" and "National Day of Prayer" events and distribute them at school to other students.  The Praying Parents' link on the school's website has been

56

removed, and advertisements in the Eagle Eye must pertain to school activities. The Intervenor-Defendants do not suggest that these policy changes in any way infringe upon their First Amendment rights.

Moreover, beginning at the start of the 2007-2008 school year, the new Lakeview principal gave the Praying Parents a choice to meet at the school during non-school hours or to meet at a nearby church building. The group chose to meet at the church building. Intervenor-Defendants did not present any evidence that non-religious groups are allowed to meet at the school during instructional time but they are not. Moreover, the Praying Parents group made a conscious choice to meet at the church rather than at the school during non-school hours, and Intervenor-Defendants do not make any claim that the group's election to meet in a church violated their constitutional rights. Thus, no showing is made that Lakeview's efforts to comply with the Establishment Clause resulted in a violation of Intervenor-Defendant's First Amendment rights. See Loren v. Blue Cross & Blue Shield, 505 F.3d 598, 607 (6th Cir. 2007) (to satisfy Article III case or controversy requirement, a party must allege such a personal stake in outcome of controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of court's remedial powers on his behalf). Therefore, the Court declines to say more about any potential or speculative violation of Intervenor-Defendants' constitutional rights.

*7. School district liability*

The Does may not base their claim against the Wilson County School System on respondeat superior liability. Under section 1983, municipal liability is conditioned upon a finding that action pursuant to official policy or custom directly caused the constitutional tort. Doe v. Claiborne County, 103 F.3d 495, 507 (6th Cir. 1996) (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691 (1978)); Steele v. Van Buren Public Sch. Dist., 845 F.2d 1492, 1495 (8th Cir.

57

1988) (same). In other words, the Does must prove that the Board itself is the wrongdoer. <u>Doe</u>, 103 F.3d at 507.

The Court explained above that the Board adopted written policies addressing First Amendment issues which Marlowe did not follow in all respects while he was Principal of Lakeview and that it was Marlowe's own policies, not those of the Board, that caused a violation of the Does' constitutional rights. Duncan, the Director of Schools, knew about the complaints of the Does, but like the situation with Neil Spencer, he did not take any direct action to resolve the complaints and relied on Marlowe to handle the matters. The Does did not present any evidence that the Board had actual notice or constructive notice of Marlowe's actions undertaken in accordance with his own unwritten policies and customs which had the effect of endorsing Christianity at Lakeview or that the Board condoned Marlowe's actions. The Does also did not present any evidence that the Board had actual or constructive notice of Duncan's action or inaction, or that the Board was deliberately indifferent to violation of the Does' constitutional rights by failing to curtail unconstitutional conduct at Lakeview. <u>See</u> <u>Williams v. Paint Valley Local Sch. Dist.</u>, 400 F.3d 360, 368-369 (6th Cir. 2005); <u>Doe</u> 103 F.3d at 508. Thus, the Does have not carried their burden to prove that the Board itself should be held liable for unconstitutional conduct that occurred at Lakeview.

### 8. Injunctive relief

"A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law." <u>Women's Medical Professional Corp. v. Baird</u>, 438 F.3d 595, 602 (6th 2006) (citing <u>Kallstrom v. City of Columbus</u>, 136 F.3d 1055, 1067 (6th Cir.1998)). The Does have proved by a preponderance of the evidence that they suffered a constitutional violation and they will suffer a continuing irreparable injury if they are not able to enroll their children in Lakeview because

Lakeview is not complying with First Amendment religious freedoms. The Does do not have an adequate remedy at law because a damages award will not alleviate the burdens faced by the Does. Accordingly, the Court will grant the Does limited permanent injunctive relief.

## IV. CONCLUSION

As explained in this opinion, certain practices at Lakeview Elementary School during the 2005-2006 school year did not have a secular purpose and were allowed or pursued to tacitly approve the activities of the Praying Parents, which had the primary effect of endorsing or promoting their Christian beliefs and programs at the school. In addition, the Praying Parents practices and programs at the school caused the Lakeview administrators and teachers to become excessively entangled with religion in violation of the Establishment Clause. Therefore, for all of the reasons stated in this opinion the Court finds in favor of the Does and against all Defendants except the Board itself. The Does are entitled to a limited permanent injunction which will be set forth in a separate Order. The Intervenor-Defendants have not presented a justiciable controversy concerning whether their First Amendment rights have been violated by the Defendants.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE